608 A.2d 534

**COMMONWEALTH of Pennsylvania**

v.

**James GRAY, Appellant.**

Superior Court of Pennsylvania.

Submitted Feb. 25, 1991.

Filed May 11, 1992.

78

James A. Lineberger, Philadelphia, for appellant.

Donna G. Zucker, Asst. Dist. Atty., Philadelphia, for Com.

Before TAMILIA, JOHNSON and CERCONE, JJ.

CERCONE, Judge:

This appeal comes to us from the judgment of sentence of life imprisonment imposed after a jury found appellant, James Gray, guilty of murder in the first degree. Appellant was also convicted of criminal conspiracy, possession of instruments of crime, and aggravated assault.[1] The lower court imposed concurrent sentences of five to ten years each on the convictions of criminal conspiracy and aggravated assault. Appellant's motion for new trial and/or in arrest of judgment was denied, and appellant filed the instant timely appeal.[2] After careful study and evaluation of the record, the briefs of the parties and the opinion of the learned trial judge, the Honorable George J. Ivins, we affirm the judgment of sentence.

The convictions against appellant arose out of the murder of Maureen Dunne and the wounding of Gregory Ogrod on July 31, 1986. Ms. Dunne was stabbed and beaten while she was sleeping at the home of Gregory Ogrod, her boyfriend, who had been engaged in the purchase of drugs with one of the assailants, Morris Spence, also a defendant

1. The conviction of possession of instruments of crime was found to merge with the first degree murder conviction for purposes of sentencing.

2. *See* Pa.R.Crim.P., Rule 359F (when post-sentence motions are decided in cases in which the death sentence is authorized, the judgment of sentence becomes final for purposes of appeal).

here. Ogrod, the primary target of the assault, was present in the room with Ms. Dunne on the night of the murder. He was also beaten and stabbed, but survived the attack which was carried out by appellant and three co-defendants: Morris (Marvin) Spence, Richard Hackett and Keith Barrett. All four defendants were convicted of first degree murder. Spence and Hackett received the death penalty for their participation in the crime; appellant and Barrett received sentences of life imprisonment at the hands of the jury. Defendant Hackett is a white male, and appellant, Spence, and Barrett are black males.

The evidence at trial revealed that the murder of Maureen Dunne and the wounding of Gregory Ogrod were inspired by the following circumstances. Gregory Ogrod, a white man, and defendant Morris Spence, a black man, were involved as partners in the sale of illegal drugs. Ogrod's function in the partnership was to supply the cash and Spence was to purchase the drugs for resale. The partnership began to deteriorate because Spence would take money from Ogrod but would neglect to purchase the drugs for which the money was intended. The relationship soured to the point where the two men made threats against each other.

Ogrod also was in a bad relationship with defendant Richard Hackett. Ogrod lived in a house which he jointly owned with his brother Walter. Walter Ogrod`invited defendant Hackett to live in the house although Gregory Ogrod strongly objected to Hackett's presence there. An ongoing dispute developed between Hackett and Ogrod, and Hackett began to search for a hit man to kill Ogrod. Hackett subsequently agreed to pay one David Carter to kill Ogrod. Carter was advised that if a girl were with Ogrod at the time of the "hit," then she too would have to be killed.

On the night before the planned attack, Spence went to Carter's house to discuss the killing. At Carter's home were appellant Gray and defendant Keith Barrett, a close friend of Carter's. During the evening, as the details of the

proposed killing were discussed, Carter, who had been offered $5,000 by Hackett, decided he was not going to participate in the plans. However, appellant, Spence, and Barrett agreed to do the killing the next night. The following night, July 31, 1986, defendant Hackett drove appellant, Spence, and Barrett to Ogrod's home. Appellant got a crowbar from Hackett's truck, while Spence and Barrett armed themselves with knives. They then went to the basement where they found Ogrod and Maureen Dunne asleep. They proceeded to stab and beat the victims. Somehow, Ogrod managed to chase his assailants out of the house. When he returned to the basement, he found the mortally wounded Maureen Dunne.[3]

After the notice of appeal had been lodged with this court in August of 1990, counsel for appellant filed a motion to withdraw which was denied. In December, 1990, appellant filed a *pro se* supplemental brief. Since appellant raised the issue of ineffectiveness of appellate counsel in this *pro se* brief on appeal, this court ordered counsel on April 5, 1991, to petition for remand so that an evidentiary hearing could be held on the issue of his ineffectiveness. On June 18, 1991, the case was remanded to the trial court for this purpose. Subsequently, on August 6, 1991, pursuant to a petition for reconsideration filed by the Commonwealth, we vacated our previous orders of April 5 and June 18, 1991, and held that we would consider the merits of both appellant's counseled and *pro se* briefs.[4]

**3.** Gregory Ogrod suffered extensive stab wounds to the head, face, neck, back and chest. Maureen Dunne suffered multiple cuts, scrapes and bruises to her face, a broken nose, broken teeth and stab wounds to her heart and left lung, all of which brought about her death.

**4.** *Cf. Commonwealth v. Lawrence,* 408 Pa.Super. 9, 596 A.2d 165 (1991) (counsel should petition the Superior Court for a remand after the filing of a *pro se* allegation of ineffective assistance of appellate counsel, whereupon the Superior Court will decide whether a remand is in fact required); *Commonwealth v. Ellis,* 398 Pa.Super. 538, 581 A.2d 595 (1990), *allocatur granted,* 528 Pa. 636, 598 A.2d 992 (1991) (for filing purposes, Superior Court will accept a *pro se* appellate brief but will not review it if a counseled brief has been filed). Since the grant of *allocatur* in *Commonwealth v. Ellis* has placed this area of the

On appeal, counsel for appellant raises the following issues:

1. Whether the trial court erred in refusing to permit counsel for appellant to inquire of veniremen who were white whether or not they would be partial to the prosecution because of the fact that the victim was white and the defendants were black.

2. Whether the defendant was denied a fair and impartial trial as a result of the impaneling of a death qualified jury.

3. Whether the trial court's alleged frequent criticism of appellant's counsel in the presence of the jury adversely and prejudicially contributed to the guilty verdict.

4. Whether the trial court erred in requiring appellant to stand trial without retained counsel of his choice.

(As to the first claim, it must be pointed out that there was one white and three black defendants.) In his *pro se* brief, appellant alleges ineffectiveness of counsel for failure to preserve the following issues in post-verdict motions for purposes of appeal:

1. That defense counsel permitted appellant to appear before the jury selection panel and jury in his prison garb.

2. That appellant was denied his right to retain paid counsel of his own choosing to represent him at trial in violation of Article I, section 9 of the Pennsylvania constitution.

3. That appellant's arrest was illegal because the police entered his house to arrest him without compliance with the knock and announce rule.

4. That appellant was denied his constitutional rights under Articles 1, 8, 9, and 14 [sic] of the United States Constitution and amendments 4, 6, and 14 where the police officers who arrested appellant willfully and

law in doubt, we elected to review the merits of both briefs filed in the instant case.

wrongfully delayed taking appellant before the nearest judicial authority (magistrate) for arraignment on the charges.

5. That counsel for appellant failed to pursue a petition for reconsideration of sentence or an appeal.

We will first consider the issues raised in appellant's counseled brief.

### Voir Dire Questions Concerning Racial Bias

Appellant's initial contention is that the lower court erred in prohibiting counsel from asking the following question on individual *voir dire:* "Would the fact that the victim in this case is white and defendants are black and that you are white cause you to be somewhat partial towards the prosecution?" Appellant contends that the case was a racially sensitive one, and therefore, the question should have been permitted. He argues that the lower court abused its discretion in not permitting the question, because the court's prohibition left in doubt the degree of racial bias among the venire persons who were selected.

In Pennsylvania, it has long been held that the scope of voir dire examination rests within the sound discretion of the trial court. *Commonwealth v. Abu–Jamal,* 521 Pa. 188, 555 A.2d 846 (1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 215, 112 L.Ed.2d 175 (1990); *Commonwealth v. Colson,* 507 Pa. 440, 490 A.2d 811 (1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986); *Commonwealth v. Richardson,* 504 Pa. 358, 473 A.2d 1361 (1984); *Commonwealth v. Futch,* 469 Pa. 422, 366 A.2d 246 (1976); *Commonwealth v. Brown,* 464 Pa. 625, 347 A.2d 716 (1975); *Commonwealth v. Segers,* 460 Pa. 149, 331 A.2d 462 (1975); *Commonwealth v. Lopinson,* 427 Pa. 284, 234 A.2d 552 (1967). However, when the issue of the potential racial bias of venire members has been raised, the Pennsylvania courts have placed some limitations on the trial court's discretion in determining the scope of voir dire. In *Commonwealth v. Brown, supra,* a black male defendant was convicted of the rape of a white female minor. The trial court refused to

allow on voir dire a question proposed by appellant to ascertain racial bias or prejudice on the part of the prospective jurors.[5] On appeal, the Pennsylvania Supreme Court held that the lower court erred in failing to pose the question. The court reasoned that the proposed question was proper because it "was designed to elicit the prospective jurors' bias or prejudice concerning black-white relationships which, if shown, would subject them to disqualification." *Id.*, 464 Pa. at 629, 347 A.2d at 718.

In *Commonwealth v. Richardson, supra,* the defendant had also been convicted of rape. The defendant was black and the victim was white. The defendant requested that the trial court ask prospective jurors on voir dire a series of five questions designed to probe their racial prejudice.[6] The trial court refused to use the language prepared by the defendant, but posed its own question as follows:

I have just been advised that the victim in this case was a white person. You see that the defendant is black. Would these racial differences present such a problem to you that it could interfere with your honest appraisal of the case and interfere with your ability to be completely fair to both the Commonwealth and the Defendant?

5. The question which the trial court refused to pose was: "Would you, or do you, get upset or take special note when you see a white girl and a black man walking together; talking together; holding hands?" *Id.*, 464 Pa. at 627, 347 A.2d at 717.

6. The five questions proposed by defense counsel were:
 1. Are there any people on the jury who are prejudiced in any way against black people?
 2. [Defendant] is a black man who is charged with raping a white woman. Because of the races of the two parties involved in this case, do you think you would have any difficulty being fair to either side?
 3. Do you believe that black people are generally more dishonest than white people?
 4. Do you believe black men like to rape white women?
 5. If the woman were to testify that the incident happened one way and [defendant] would testify that the incident happened in an entirely different way, would you tend to believe the testimony of the complainant merely because she was white?
 *Id.*, 504 Pa. at 361, 473 A.2d at 1362.

504 Pa. at 361, 473 A.2d at 1362. The *Richardson* court found that the lower court's conduct of the voir dire was adequate and not an abuse of discretion. *Id.,* 504 Pa. at 364, 473 A.2d at 1363. The court reasoned that the case, despite the fact that it involved a black defendant and a white victim, was "not one where any racial differences between the defendant and victim were emphasized by evidence presented at trial." *Id.,* 504 Pa. at 363, 473 A.2d at 1363. In view of "the absence of race-related issues," the *Richardson* court concluded that more extensive voir dire examination along racial lines was unnecessary. *Id.* The court emphasized that

> under the circumstances, where there are not factors present to infuse the case with an enhanced racial sensitivity, and racial differences were not a focus of evidence at trial, the one voir dire question posed by the trial court was sufficiently specific and probing to reveal prejudices which might have bearing upon the case.

*Id.,* 504 Pa. at 364, 473 A.2d at 1364.

The *Richardson* requirement that a case be "racially sensitive" before a trial judge must inquire more thoroughly into the racial prejudice of the venire was also a requirement of federal constitutional law at the time of the *Richardson* decision. In *Ristaino v. Ross,* 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976), the United States Supreme Court held that inquiry into racial prejudice at voir dire is not constitutionally required unless the facts of the case "suggest a significant likelihood that racial prejudice might infect [the defendant's] trial." *Id.* at 598, 96 S.Ct. at 1022, 47 L.Ed.2d at 265. Similarly, in *Rosales–Lopez v. United States,* 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981), a plurality of the Supreme Court held that only where racial issues are "inextricably bound up with the conduct of the trial" will the trial judge be constitutionally required to inquire into the racial prejudice of the venire. Relying on *Ristaino,* Justice White, writing for the plurality, explained:

> Only when there are more substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors in a particular case does the trial court's denial of a

defendant's request to examine the jurors' ability to deal impartially with this subject amount to an unconstitutional abuse of discretion. Absent such circumstances, the Constitution leaves it to the trial court, and the judicial system within which the court operates, to determine the need for such questions.

*Id.* at 190, 101 S.Ct. at 1635, 68 L.Ed.2d at 29.[7]

In *Turner v. Murray,* 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986), the Court again addressed the issue. In *Turner,* the petitioner was a black man who had been convicted in a state trial court of "capital murder" and sentenced to death. The victim of the fatal shooting was a white man. During voir dire, the state trial judge refused petitioner's request to question the prospective jurors on racial prejudice. On appeal, the United States Supreme Court held that since this was a capital case involving a defendant and victim of different races, the lower court's refusal to pose the requested question was error. Specifically, the Court held that:

a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias. The rule we propose is minimally intrusive; as in other cases involving "special circumstances," *the trial judge retains*

7. Justice White also found that *Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973) was a case in which racial issues were "inextricably bound up with the conduct of the trial." *Rosales–Lopez v. United States,* 451 U.S. at 189, 101 S.Ct. at 1635, 68 L.Ed.2d at 29. In *Ham,* a black man who had been active in the civil rights movement was convicted in state court of possession of marijuana. Part of Ham's defense was that he had been "set up" by the police in his community because of his participation in the civil rights movement. Ham requested that certain questions designed to probe the racial bias of the venire be asked on voir dire. The trial judge did not permit the questions. On appeal, the United States Supreme Court held that the due process clause of the Fourteenth Amendment required the trial judge to interrogate the potential jurors in this case on the subject of racial bias. However, the court held that the question(s) as to racial bias were not required to be put in any particular form, nor were any particular number of questions required to be asked simply because they were requested by the defendant. *Ham v. South Carolina,* 409 U.S. at 527, 93 S.Ct. at 850–51, 35 L.Ed.2d at 50.

*discretion as to the form and number of questions on the subject, including the decision whether to question the venire individually or collectively....* Also, a defendant cannot complain of a judge's failure to question the venire on racial prejudice unless the defendant has specifically requested such an inquiry.

*Id.* at 36–37, 106 S.Ct. at 1688–89, 90 L.Ed.2d at 37 (emphasis added). The Court vacated the judgment of sentence and remanded the case for resentencing; however, the Court also held that "with respect to the guilt phase of petitioner's trial, we find this case to be indistinguishable from *Ristaino,* to which we continue to adhere." *Id.* at 37–38, 106 S.Ct. at 1689, 90 L.Ed.2d at 37.[8]

■ In two other Supreme Court cases, *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) and *Mu'Min v. Virginia,* —— U.S. ——, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991), the court projects a more thorough inquiry into bias and prejudice in a wider realm of crimes. But suffice it to say that under *Turner, supra,* a defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias. All this is within the exercise of the court's discretion, as in "special circumstances cases," to determine the form and number of questions to be asked including the decision whether to proceed with venire individually or collectively.

In the instant capital case, the record demonstrates that the race, color or ethnic background of the defendants was not an issue at trial, nor had the prosecutor emphasized it. In fact, as the trial judge correctly indicated in this opinion,

8. Only four justices were of the opinion that an unacceptable risk of racial prejudice was created solely at the capital sentencing stage and not at the guilt stage of the *Turner* trial. A fifth justice concurred in this result without opinion. Thus, the decision to vacate petitioner's sentence but not his conviction became the judgment of the court. A majority of the justices joined in the court's holding that a defendant who is accused of a capital offense against a victim of a different race is constitutionally entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias. *See Turner v. Murray,* 476 U.S. at 28, 106 S.Ct. at 1683, 90 L.Ed.2d at 30.

the only relevant color in this case was "green," "the color of money," because here the victim was killed as a result of a dispute and a quarrel among her boyfriend, Gregory Ogrod, Marvin Spence and Richard Hackett over illegal drugs and Spence's alleged mishandling of funds. However, despite the lack of a racial issue, the trial judge during collective and individual *voir dire* clearly inquired as to whether difference in race would affect the members of the venire panel's ability to be impartial and unbiased in their deliberations on the relevant law and facts presented in the case.

In fact, the broad scope of the trial judge's questions on the race issue in the process of the collective and individual *voir dire* procedure could not have failed to fall on the ears and minds of the venire panel like the recurring roll of a drumbeat whose sound they could not escape or ignore in the clear and understandable message brought to them by the judge.[9]

In review of excerpts from the judge's instructions in the collective *voir dire* as they relate to race issues, we find the following:

> There must be no prejudice or bias in a case like this in approaching the determination of guilt or innocence, individually or collectively, of these defendants. Certainly, ladies and gentlemen of the jury panel, there must be no racism, consciously or subconsciously, if you please, coming into the determination of the issue here involved ... what is such a juror? A fair, impartial and unprejudiced juror is one who has no feeling of bias, prejudice or partiality or collectively towards or against persons individually or collectively....

N.T. June 21, 1988 at 42–43.

> Do any of you have a fixed opinion as to the guilt or innocence of these defendants, individually or collectively? If so, please raise your hands (footnote omitted).... Is there any among you who have any feelings against

9. There are six (6) volumes in the record relating to *voir dire* covering 725 pages, which encompass the essence of the judge's meticulous search for impartial jurors.

any of these defendants, both the three black men and the one white man, because of their race or color? If so, please raise your hand.[10]

N.T. June 21, 1988 at 57–59. *See also* N.T. June 21, 1988, 52–53 and 58, wherein the trial court assured itself that each panel member could follow the court's instructions, avoid bias and be fair and impartial. After these questions the judge asked counsel or the Commonwealth and the defendants if they wished to add anything and they all replied that they did not.

There were three panels of venire persons brought before the lower court, and to each the trial judge addressed questions, to-wit:

Now, ladies and gentlemen of the jury panel, as a result of this matter, two people were injured. One was a young white male about nineteen years of age, the other a young white female, who died as a result of the matter, the case, as you heard me tell you. I pose this question to all of you. Is there any among you that have any feelings against any of these defendants, both the three black men and the one white man, because of their race or color? If so, please raise your hand.

N.T. June 21, 1988 at 59.

Now, ladies and gentlemen of the jury panel, you already heard from me that a young white girl died as a result of this incident alleged to have taken place, and a young white man was injured. You will note, quite obviously, that three out of the four defendants are members of the black race. I therefore pose this question to all of you. Is there any among you that have any feelings against all the defendants individually or collectively because of the race or color of any of the defendants? If so, please raise your hand.

N.T. June 24, 1988 at 410.

Now, ladies and gentlemen of the jury panel, it is quite obvious to you that three of the defendants in this matter

**10.** All jurors expressing racial prejudices were dismissed from the venire panel.

are members of the black race. One is a member of the white race. As I have heretofore advised you and told you, the young lady involved in this matter who died was a young white girl. The young man who was injured was a young white man. I've told you this before. I pose this question to you. Is there any among you that have any feelings whatsoever against the defendants on account of their race or color? If so, please raise your hand.

N.T. June 28, 1988 at 691–92.

It is an understatement to say the questions posed by the learned judge in these group *voir dire* procedures fell heavily on the conscience and understanding of each prospective juror as to their meaning and significance in satisfaction of *Turner*.[11] When the judge completed the collective *voir dire*, court and counsel began individual *voir dire* of the prospective jurors. For each potential juror, the court posed a series of questions with the purpose of inquiring into the qualifications of the juror as follows:

Q. Okay, now did he hear all those questions that I asked before?

A. Yes.

Q. Did you understand them all?

A. Yes.

Q. You did not raise your hand in response to any of them?

. . . .

Q. Now, I come back. Having heard all the questions and not having responded to them, I pose this question to you, ma'am. If you're chosen as a member of the jury in this case, would you, to the best of your ability, be a fair and impartial juror, fair to the Commonwealth as well as to the defendants?

A. Yes.

Q. If you were so chosen, would you once again to the best of your ability, make your decisions based solely

11. *Turner* is applicable to the instant case because the majority in *Turner* directed its holding to capital cases involving interracial crimes, such as in the instant case.

upon the facts presented in this courtroom and with the instructions of the court?

A. Yes.

N.T. June 21, 1988 at 94–96.

After the court finished its individual *voir dire,* appellant counsel was given the opportunity to continue his own individual *voir dire.* In this manner the screening of five members of the venire panel passed without incident or objection. After the sixth venireperson assured the court that she could judge the case fairly and impartially, appellant's counsel began individual *voir dire* questioning for the first time as follows:

> Q. Ma'am, as you are selected as a juror in this case, you will hear that the victim in this case was a teenage, white lady and, as you can see, three of the defendants in this case are black men. Would the fact that the victim in the case is white and the defendants are black and that you are white cause you to be somewhat partial towards the prosecution?

Just as she responded to the court's same question during group *voir dire,* the woman juror replied, "I don't think so." N.T. June 21, 1988, 112–113. Despite this response, the appellant exercised a peremptory challenge and the juror was excused. After this evident display of tactical delay on the part of trial counsel, the court reminded him that the race question had already been covered thoroughly and there was no good reason for further delaying the jury selection process with repetitious questions. Jury selection then continued for a total of six days with the judge carefully examining each potential juror collectively and individually on racial problems and the necessity for a fair trial.[12]

12. Venirepersons who indicated that racial considerations would preclude their impartiality were dismissed for cause. N.T. June 24, 1988, 421, 444. Also, those potential jurors who did not respond to the race question during group *voir dire* were excused for cause when their responses to the court's individual *voir dire* indicated prejudice or bias. *See, e.g.,* N.T. June 27, 1988, 543–545.

In light of the foregoing, counsel's complaint that he was precluded from having an eye-to-eye contact on individual *voir dire* of the jurors is meritless. His claim apparently is that the jurors would answer more forthrightly if counsel could face the jurors with questions. This is a spurious argument to make when in the six volumes of *voir dire* procedure, the trial judge, with ultimate courteousness, implored the jurors to be comfortable, at ease, and not to be troubled by the novel experience of serving as jurors. The atmosphere the judge created was as conducive, if not more clearly so, of a free, open and uninhibited opportunity for response on the part of each juror to the judge's questions than would be possible in answering an attorney who normally does not have the opportunity to establish so comfortable a courtroom atmosphere. It fittingly falls within the premise of a judge's role to control the demeanor, atmosphere and conduct in the courtroom.[13]

■ As to appellate counsel's complaint that individual *voir dire* was limited, we find that Pa.R.Crim.P., Rule 1106(e), 42 Pa.C.S.A. is of no help to this argument. The rule provides: "In capital cases, the individual voir dire method must be used, unless the defendant waives the alternative...." Nothing in this rule provides who is to conduct this individual *voir dire*. Where the trial judge conducts a careful *voir dire* in his or her quest for an impartial, unbiased juror on all possible issues that affect a juror's qualification, the judge's individual *voir dire*, as was done in this case, is sufficient to satisfy the requirements of this rule under the provisions of *Turner, supra*. Under the circumstances of this case pertaining to *voir dire* methods, we choose not to ignore the legal history and tradition that give the trial judge the ineffable role of impartial arbiter and the conscience of fairness and justice. Finally, in view of the death sentence for Richard Hackett, the white defendant, and a life sentence for the appellant, a black defen-

---

13. See procedure of questions asked by the trial judge of the remaining selected members of the jury in N.T. June 22, 1988 at 167, 206, 249, 262; N.T. June 23, 1988 at 298; N.T. June 24, 1988 at 425; N.T. June 27, 1988 at 556, 622; N.T. June 28, 1988 at 724, 741–42.

dant, it is difficult to accept the argument made in the case by appellant's counsel. This is especially so when no objection was made to any of the jurors accepted by them for service in this trial when called upon to answer by the judge. *See Beck v. Washington,* 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962) (fact that accused did not challenge seated jurors is strong evidence that he believed the jurors were not biased). Appellant has cited *Commonwealth v. Dukes,* 460 Pa. 180, 331 A.2d 478 (1975) in support of his argument. However, in *Dukes,* both the Commonwealth and defense counsel were given broad scope in collective and individual *voir dire* which is not the issue here. For these reasons, we find no error in the judge's limitation to counsel, relating to individual *voir dire* of the venire panel.

## Death–Qualification of Jury

Appellant's next contention is that he was denied a fair and impartial trial because the jury which convicted him was "death-qualified." Appellant asks this court to "take a bold, innovative stand" and to recognize that such juries are conviction-prone. He urges us to take judicial notice of the "myriad and abundant studies which indicate the inherent prejudice of death-qualified juries," and on this basis, to grant him a new trial.

However, our supreme court has unqualifiedly rejected this argument in *Commonwealth v. DeHart,* 512 Pa. 235, 516 A.2d 656 (1986), *cert. denied,* 483 U.S. 1010, 107 S.Ct. 3241, 97 L.Ed.2d 746 (1987), saying:

> Appellant also maintains that the use of peremptory challenges to exclude wavering jurors, coupled with the elimination of *"Witherspoon-*excludables" [*Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)], results in the impanelling of a prosecution-prone jury. *Both the United States Supreme Court and this Court have rejected the argument that the death qualification process produces juries which are "slanted" toward conviction. Lockhart v. McCree,* [476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986)], *Commonwealth v.*

*Smith,* [511 Pa. 343, 513 A.2d 1371 (1986)], *cert. denied,* 480 U.S. 951, 107 S.Ct. 1617, 94 L.Ed.2d 801 (1987)], *Commonwealth v. Morales,* [508 Pa. 51, 494 A.2d 367 (1985)], *Commonwealth v. Colson,* [507 Pa. 440, 490 A.2d 811 (1985)]. *Commonwealth v. Maxwell,* [505 Pa. 152, 477 A.2d 1309 (1984)].

*Id.,* 512 Pa. at 250–51, 516 A.2d at 664 (emphasis added).

While our supreme court did not in its opinion address at length its basis for rejecting the "prosecution-proneness" theory, it did find persuasive the language in *Lockhart v. McCree, supra.* In *McCree,* the United States Supreme Court rejected appellant's argument that when the state "tips the scales" by excluding prospective jurors with a particular viewpoint an impermissible partial jury results. *Id.,* 476 U.S. at 178, 106 S.Ct. at 1767, 90 L.Ed.2d at 150–51. The *DeHart* court held that the exclusion of "wavering venire persons" does not mean that a jury biased against a defendant has been produced. The court rejected the "notion that the exclusion of jurors expressing uncertainty as to their ability to impose the death penalty results in the impanelling of a jury biased in favor of the prosecution. *Commonwealth v. DeHart, supra,* 512 Pa. at 251–52, 516 A.2d at 664–65.

■ Furthermore, it is only because of the Commonwealth's brief on this point that we are able to discuss the claim of appellant. Otherwise this issue is clearly waived owing to appellant's failure, in compliance with the Pennsylvania Supreme Court rules, to direct us in his brief to the specific place in the record where facts and legal arguments purportedly support his position. Pa.R.A.P., Rule 2119(c), 42 Pa.C.S.A. If the defects in the brief are substantial, the appeal may be quashed. *Taurino v. Ellen,* 397 Pa.Super. 50, 579 A.2d 925 (1990), *allocatur denied,* 527 Pa. 603, 589 A.2d 693 (1991); *Commonwealth v. Rozanski,* 289 Pa.Super. 531, 433 A.2d 1382 (1981).

According to the Commonwealth's brief, the lower court posed the following questions to each of the three venire

panels, and again referred to the question during individual *voir dire:*

> Now, ladies and gentlemen of the jury panel, I pose this question to you, to all of you. Do any of you have any moral or philosophical objections to considering the imposition of the death penalty under appropriate circumstances or in an appropriate case? If so, please raise your hand.

After this question was posed to the first panel, four prospective jurors responded affirmatively to the question. When the question was posed to the second panel, eight jurors responded affirmatively. After posing the question to the third panel, the court received another eight affirmative responses.[14]

At this point, appellant again fails to prove that the court impanelled a death-qualified jury. Here, unlike the situation where the Commonwealth provided references which appellant failed to do, we cannot provide appellant relief. In addition, as we have already said, no objections by defendant or his counsel were made to the qualifications of the seated jury. Without appropriate record citation, there is nothing before us on which to review the appellant's contention that the lower court impanelled a death-qualified jury, for he does not direct us to the place in the record where such impanelling in fact occurred. Since we are unable to determine whether a death-qualified jury as defined in *Witherspoon* was in fact impanelled, the issue is waived. *See Commonwealth v. Rozanski,* 289 Pa.Super. 531, 433 A.2d 1382 (1981).[15]

---

**14.** Jurors who indicated opposition to the death penalty were dismissed from the venire panel.

**15.** We cannot stress strongly enough in this case our displeasure with appellate counsel's failure to follow our Supreme Court's appellate rules which require specific reference to places in the record where facts and legal arguments pertinent to appellant's claims can be found. Six thousand, seven hundred and forty-three (6,743) appeals were filed in our court in 1991. Thus, we are not speaking of a small number of cases which would allow us to scour the records in each case despite an appellate counsel's failure to abide by the rules. If

■ Assuming *arguendo* that appellant had not waived the issue, *Witherspoon* would nevertheless direct us to find that the contention is without merit. *Witherspoon* holds that a death sentence may not be imposed by a death-qualified jury; it does not direct that such a jury may not convict. *Commonwealth v. Dukes,* 460 Pa. 180, 188, 331 A.2d 478, 482 (1975). Thus, assuming *arguendo* that the lower court in fact impanelled a death-qualified jury, since appellant did not receive a sentence of death, the prohibitions of *Witherspoon* do not apply. *See Witherspoon v. Illinois,* 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21, 20 L.Ed.2d at 785 n. 21 (holding of Court did not render Witherspoon's conviction invalid, but only his sentence); *Bumper v. North Carolina,* 391 U.S. 543, 545, 88 S.Ct. 1788, 1790, 20 L.Ed.2d 797, 800 (1968) (Court's decision in *Witherspoon* does not apply where the jury recommends a sentence of life imprisonment). *Accord Commonwealth v. Dukes, supra; Commonwealth v. Roach,* 444 Pa. 368, 282 A.2d 382 (1971).

■ In addition, as we have previously stated, the notion which appellant propounds that exclusion of prospective jurors who would not apply the death penalty results in a conviction-prone jury has been rejected. *See Commonwealth v. DeHart,* 512 Pa. 235, 251–52, 516 A.2d 656, 664–65 (1986), *cert. denied,* 483 U.S. 1010, 107 S.Ct. 3241, 97 L.Ed.2d 746 (1987) ("[w]e reject the notion that the exclusion of jurors expressing uncertainty as to their ability to impose the death penalty results in the impanelling of a jury biased in favor of the prosecution"); *Commonwealth v. Sneed,* 514 Pa. 597, 526 A.2d 749 (1987) (permitting Commonwealth to challenge prospective jurors for cause based upon assertion that jurors could not impose death penalty in proper case did not deprive defendant of federal or state constitutional right to fair and impartial jury from representative cross-section of community despite defendant's claim that death-qualified juries are conviction-

litigants freely ignore proper procedure, what purpose do the rules serve?

prone); *Commonwealth v. Smith*, 511 Pa. 343, 351, 513 A.2d 1371, 1375 (1986), *cert. denied*, 480 U.S. 951, 107 S.Ct. 1617, 94 L.Ed.2d 801 (1987) ("the 'death qualification' process is consistent with constitutional trial guarantees"); *Commonwealth v. Colson*, 507 Pa. 440, 490 A.2d 811 (1985), *cert. denied*, 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986) (prospective juror was properly excluded where juror's testimony established an irrevocable commitment to vote against the death penalty); *Commonwealth v. Maxwell*, 505 Pa. 152, 165, 477 A.2d 1309, 1316 (1984), *cert. denied*, 469 U.S. 971, 105 S.Ct. 370, 83 L.Ed.2d 306 (1984) ("[s]imply questioning potential veniremen on their position regarding the death penalty, or excluding those who are strongly opposed to it and cannot impose it under any conditions, does not necessarily produce a prosecution-oriented jury"); *Commonwealth v. Bradfield*, 352 Pa.Super. 466, 508 A.2d 568 (1986), *allocatur denied*, 513 Pa. 633, 520 A.2d 1384 (1987) (appellant failed to show that exclusion of prospective jurors opposed to death penalty caused prejudice, and trial court did not err in refusing to grant new trial on this basis). The *DeHart* court explained that an impartial jury consists of "nothing more than 'jurors who will conscientiously apply the law and find the facts.' " *Id.*, 512 Pa. at 251, 516 A.2d at 664 (quoting *Lockhart v. McCree*, 476 U.S. 162, 178, 106 S.Ct. 1758, 1767, 90 L.Ed.2d 137, 151 (1986)). Both prosecution and defense in a criminal prosecution "have traditionally employed peremptory challenges to remove prospective jurors they believe will be unfavorable to their position." *Commonwealth v. DeHart*, 512 Pa. at 251, 516 A.2d at 664. In this case, no objections were made by appellant or his counsel to the qualifications of the seated jury. Given this state of the law, appellant's argument would have failed even if he had not waived it.

*Alleged Criticism of Counsel in the Jury's Presence*

■ Appellant's next contention on appeal is that he is entitled to a new trial because the lower court's "frequent criticism of counsel in the jury's presence adversely and

prejudicially contributed to the guilty verdict." Once again, appellant has failed to provide us with a single record citation to support his argument. Without such citation, we are completely unable to conduct a review of this claim. The absence of citation to any instance of the lower court's alleged improper conduct prohibits any review of appellant's contention. Accordingly, we must find the claim waived. *See* Pa.R.A.P., Rule 2119(c); *Commonwealth v. Dozier,* 294 Pa.Super. 249, 439 A.2d 1185 (1982); *Commonwealth v. Rozanski,* 289 Pa.Super. at 546, 433 A.2d at 1390.

## Appellant's Right to Private Counsel

The next issue which appellant has raised in his counseled brief is that the trial court erred in "forcing [appellant] to stand trial without retained counsel of his choice." Appellant asserts that he was prevented from retaining the services of private counsel, and was forced by the court to accept the services of appointed counsel. Again, lacking record responses, we discern the following scenario from the briefs of the parties and the opinion of the lower court.

Appellant was represented by court-appointed counsel during pretrial discovery, preparation of the defense, filing of pretrial motions, and litigation of those motions prior to trial. On June 16, 1988, at the conclusion of the hearing on appellant's motion to suppress, the court received a letter from private counsel, Nino Tinari, Esquire, indicating that appellant wished to retain his services. However, Mr. Tinari informed the court that he would not be able to represent appellant until at least June 27, 1988. The lower court then advised appellant that he would have to continue to be represented by appointed counsel at least until jury selection which was to begin on June 20, 1988. The court explained to appellant that if, at the conclusion of jury selection, Mr. Tinari was available and appellant still wished to have Mr. Tinari represent him, then the court would permit appellant to be represented by him. The lower court

noted in its opinion that Mr. Tinari was not available at the conclusion of *voir dire* due to another commitment.

 The Sixth Amendment to the Constitution of the United States requires that the accused be given the assistance of counsel at every critical stage of a criminal prosecution. *Commonwealth v. Ritchey*, 431 Pa. 269, 272, 245 A.2d 446, 448 (1968) (citing *White v. State of Maryland*, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963)); *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)). A critical stage of a criminal proceeding is one in which substantial rights of a criminal accused may be affected. *Mempa v. Rhay*, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967); *Commonwealth ex rel. Rambeau v. Rundle*, 455 Pa. 8, 17, 314 A.2d 842 (1973); *Commonwealth v. Tarver*, 253 Pa.Super. 185, 384 A.2d 1292 (1978). Certainly, a criminal defendant has a right to be represented by counsel at trial. *Gideon v. Wainwright, supra*, 372 U.S. at 343, 83 S.Ct. at 796, 9 L.Ed.2d at 804 (accused has fundamental right to assistance of counsel in criminal prosecution); *Commonwealth v. Grant*, 229 Pa.Super. 419, 323 A.2d 354 (1974). "The right to counsel includes not only the right to have counsel appointed when the defendant is indigent, but also the right of an accused to a reasonable opportunity to secure private counsel of his own choosing." *Commonwealth v. Holzer*, 480 Pa. 93, 105, 389 A.2d 101, 107 (1978) (citing *Crooker v. California*, 357 U.S. 433, 439, 78 S.Ct. 1287, 1291, 2 L.Ed.2d 1448 (1958) and *Pirillo v. Takiff*, 462 Pa. 511, 341 A.2d 896, 900 (1975), *cert. denied*, 423 U.S. 1083, 96 S.Ct. 873, 47 L.Ed.2d 94 (1976)). *See also Commonwealth v. Atkins*, 233 Pa.Super. 202, 336 A.2d 368 (1975).

 The right to choose a particular counsel, however, is not absolute. *Commonwealth v. Atkins*, 233 Pa.Super. at 207, 336 A.2d at 371. The accused's right to counsel of his own choice must be weighed and balanced against the public need for the efficient and effective administration of criminal justice. *Moore v. Jamieson*, 451 Pa. 299, 306 A.2d 283 (1973) (quoting *United States ex rel. Carey v. Rundle*,

409 F.2d 1210, 1214–15 (3rd Cir.1969), *cert. denied,* 397 U.S. 946, 90 S.Ct. 964, 25 L.Ed.2d 127 (1970)). Whether a continuance should be granted in order for the defendant to secure counsel of his choosing is a matter within the discretion of the trial judge, "and no prophylactic rule exists for determining when a denial of a continuance amounts to a violation of due process." *Commonwealth v. Atkins,* 233 Pa.Super. at 207, 336 A.2d at 371.

> [I]t is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.

*Id.,* 233 Pa.Superior Ct. at 207–08, 336 A.2d at 371–72 (quoting *Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964)).

In the instant case, appellant was arrested in July, 1986. He was represented by court-appointed counsel from that time until June, 1988, at which time the litigation of appellant's pretrial motions began prior to trial. At the conclusion of the hearing on appellant's motion to suppress, Mr. Tinari notified the lower court that appellant desired to be represented by him. However, Mr. Tinari was not available to represent appellant until at least a week later, and the lower court, who was trying all four defendants together, was ready to proceed with jury selection. The lower court therefore decided to require that appellant proceed to jury selection with his court-appointed counsel. At the end of jury selection, if Mr. Tinari was then available, the court indicated that he would be permitted to represent appellant. In the opinion of April 26, 1990, the lower court expressed

the following reasons for deciding to refuse appellant's request for a continuance:

(1) There were three other defendants charged whose counsel had made arrangements to be present for trial, (2) the inability of Mr. Tinari to give the Court a date certain as to when he would be available to try the matter, (3) arrangements had been made by the District Attorney with respect to the appearance of Commonwealth witnesses, (4) there had been several prior continuances in the matter due to various reasons including *inter alia* the unavailability of Defense Counsel, the unavailability of a Judge to hear the case, and the need for more time for investigation.

(Opinion of April 26, 1990, Ivins, J., presiding, at 56–57).

We find no abuse of discretion in the lower court's decision. Appellant had been represented for almost two years by court-appointed counsel, and did not request new counsel until June 16, 1988. At that point, the preliminary stages of a four-defendant murder trial were already underway. To have continued the case for the appointment of Mr. Tinari would have disrupted the schedules of the court, the attorneys for appellant's three co-defendants, as well as the trial witnesses. The lower court did not totally preclude appellant from securing Mr. Tinari's services. It left open the possibility of a change in counsel if Mr. Tinari would have been available for jury selection or after the *voir dire* was complete. In this fashion, the lower court performed the required balancing of interests. It recognized the right of appellant to private counsel of his own choosing. However, in view of the late stage of the prosecution at which the request was made, and the burden to the efficient administration of justice which a continuation of trial at such a stage would involve, the lower court determined that it was necessary to place some limitations on appellant's request.

The lower court's ruling was not unreasonable given the circumstances present at the time of appellant's request. The court acted well within its discretion, according appro-

priate deference to both appellant's right to counsel of his choice and the need for the efficient administration of justice in a prosecution nearly two years old, in which the commencement of trial was imminent. Accordingly, we can grant appellant no relief on this claim.

### Appellant's Pro Se Brief

Next, we will address the claims raised by appellant in his *pro se* brief on appeal. Each of these claims is raised in the context of the alleged ineffectiveness of appellant's court-appointed counsel, who represented appellant at trial and on this appeal. Claims of ineffectiveness of counsel are subject to a three part analysis. The initial inquiry is "whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit; for counsel cannot be considered ineffective for failing to assert a meritless claim." *Commonwealth v. Durst,* 522 Pa. 2, 4, 559 A.2d 504, 505 (1989). If this threshold inquiry is met, it must next be determined that the particular course followed by counsel had no reasonable basis designed to effectuate his client's interests. *Id.* The final inquiry is to establish the precise manner in which counsel's commission or omission prejudiced the appellant. *Id.*

### A. Appearance at Trial in Prison Garb

Appellant first contends that his court-appointed counsel was ineffective for failing to preserve for appeal the issue of appellant's appearance at trial in prison garb. Appellant alleges, and the record supports his assertion, that he appeared in court in prison trousers on June 28, 1988. On that date, the court was engaged in the process of jury selection. Counsel for appellant notified the court that appellant was "partially clothed in prison garb," but stated that he did not believe that the fact that the trousers were prison trousers was "discernable to the civilian eye." N.T. 6/28/88 at 665. Counsel noted that he did not object to proceeding with the selection of the jury. On the previ-

ous day, appellant had requested an order of court authorizing the sheriff's officer to permit him to change his clothes in the City Hall holding cell. The court had refused to issue such an order without being informed by the sheriff that such order would not violate the sheriff's policy prohibiting such practice. N.T. 6/27/88 at 661–63.

A failure of counsel to object to the appearance of a defendant before the jury in prison garb is a serious omission, *Commonwealth v. Henry*, 341 Pa.Super. 146, 151, 491 A.2d 193, 195 (1985).

> Under our system of criminal justice, defendants are presumed innocent until proven guilty. The burden is on the state to bring forth evidence to overcome that presumption and to prove defendant guilty beyond a reasonable doubt. Such evidence, however, must be competent and probative. It cannot rely for its value upon prejudice and fear. It cannot insinuate without rationale....

> A defendant in prison garb gives the appearance of one whom the state regards as deserving to be so attired. It brands him as convicted in the state's eyes. It insinuates that the defendant has been arrested not only on the charge being tried but also on other charges for which he is being incarcerated.

*Commonwealth v. Kellum*, 339 Pa.Super. 513, 520, 489 A.2d 758, 763 (1985), *quoting Commonwealth v. Keeler*, 216 Pa.Super. 193, 195–96, 264 A.2d 407, 409 (1970), *cert. denied sub nom. Risser v. Pennsylvania*, 400 U.S. 957, 91 S.Ct. 355, 27 L.Ed.2d 265 (1970). In *Kellum*, the court held that permitting a defendant to appear before a jury in prison garb constituted error requiring a new trial. *Commonwealth v. Kellum*, 339 Pa.Super. at 520, 489 A.2d at 762. However, the *Kellum* court also found that the error in that case was harmless because the evidence supporting appellant's conviction was overwhelming and because the defendant had himself testified and had provided the jury with an explanation for the fact of his appearance in prison clothing. *Id.*, 339 Pa.Superior Ct. at 521, 489 A.2d at 762.

In *Commonwealth v. Henry, supra,* the court held that the defendant was entitled to a remand for a hearing to determine whether he could prove his claim of ineffectiveness which was based on the allegation that counsel had permitted him, without objection, to appear before the jury in prison garb. *Id.,* 341 Pa.Super. at 151, 491 A.2d at 196. The court held that such an allegation met the requirement that an individual seeking to prove a claim of ineffectiveness "set forth an offer to prove at an appropriate hearing sufficient facts upon which a reviewing court can conclude that trial counsel may have, in fact, been ineffective." *Id.,* 341 Pa.Superior Ct. at 151, 491 A.2d at 195–96, *quoting Commonwealth v. Pettus,* 492 Pa. 558, 563, 424 A.2d 1332, 1335 (1981).

In *Keeler, supra,* the court vacated judgment of sentence where the defendant had appeared before the jury for approximately one and one-half hours wearing prison garb on the first day of trial. The Superior Court held that the trial court's refusal to continue the case to permit defendant to procure civilian clothes or to obtain such clothing for him "prejudiced the jury against him and demeaned him before conviction." *Commonwealth v. Keeler,* 216 Pa.Super. at 198, 264 A.2d at 410. "In no case," the *Keeler* court held, "should appellant have undergone the severe prejudice of appearing before the jury as this man was required [to do]." *Id.*

While the claim of appearance at trial in prison garb is a serious one, we are not convinced that appellant is entitled to a hearing on counsel's alleged ineffectiveness for failing to preserve this issue for appeal. A party asserting a claim of ineffectiveness must allege sufficient facts upon which a reviewing court can conclude that trial counsel may have been ineffective because the appellate courts will not consider such claims in a vacuum. *Commonwealth v. Durst,* 522 Pa. at 4, 559 A.2d at 505; *Commonwealth v. Pettus,* 492 Pa. 558, 424 A.2d 1332 (1981).

In *Keeler, supra,* in which the defendant's sentence was vacated because he had appeared before the court in prison garb, the court noted that the prison garb which was worn

by the defendant at trial was the type of attire which was "easily recognized by the general public as the clothes commonly worn by prisoners." *Keeler*, 216 Pa.Super. at 195, 264 A.2d at 408. Here, appellant has made no such contention. In fact, the record of trial reveals that both trial counsel and the court believed that the prison trousers worn by appellant during jury selection on June 28, 1988, were indistinguishable from similarly colored civilian clothing. Finally and most importantly, although there is abundant evidence presented at trial that appellant's blue colored pants, the only piece of clothing at issue here, was not discernible as prison garb, counsel in carrying his full responsibility to his client made every effort to see that the pants were exchanged for some other pants, going so far as to tell the court that one of appellant's associates would bring another pair of pants to City Hall which appellant could exchange for the blue pants. We see no evidence of ineffectiveness in this case where counsel did not pursue a meritless claim. *See Commonwealth v. Durst, supra.*

We think it is insufficient for purposes of establishing an ineffectiveness claim of arguable merit for appellant to simply allege that he appeared at trial "in prison garb." Without further elaboration and the supplying of additional facts concerning the recognizability of his clothing as prison issue, appellant has not set forth sufficient facts upon which we can conclude that counsel may have in fact been ineffective. Accordingly, appellant has not established that his claim of ineffectiveness of counsel has arguable merit, and he is therefore entitled to no relief.

### B. Right to Select Counsel

■ The next claim which appellant raises *pro se* on appeal is that his counsel was ineffective because he failed to argue and preserve for appeal the contention that the lower court denied appellant his constitutional right to obtain counsel of his own choosing. Appellant asserts that a short continuance for the purpose of permitting him to secure the services of counsel of his own choosing would

have satisfied both his constitutional right and the interest
of the public in the prompt and efficient administration of
justice. We have previously determined that the lower
court did not err when it declined to continue the case so
that appellant could retain private counsel. Counsel will
not be deemed ineffective for failing to assert a meritless
claim. *Commonwealth v. Durst*, 522 Pa. at 4, 559 A.2d at
505. Since the foundation upon which appellant's allegation
of ineffectiveness is based lacks merit, his assertion of
ineffectiveness must also fail.

### C. Police Failure to Knock–and–Announce

Appellant's next claim is that his counsel was inef-
fective for failing to preserve in post-verdict motions and on
appeal the issue of his alleged illegal arrest. Appellant
asserts that his arrest was illegal due to the failure of the
police to knock and announce their identity before entering
the residence where appellant was staying. Appellant con-
tends that the rule which requires the police to knock,
announce their identity and possession of a warrant, and
then wait a sufficient period of time for either (1) the door
to be opened, or (2) the realization that the occupants are
not going to permit their entry, was not followed in his
case. *See* Pa.R.Crim.P., Rule 2007, 42 Pa.C.S.A. Appellant
asserts that this alleged failure by the police on the date of
his arrest violated his right to privacy under the Fourth
Amendment, and that counsel was ineffective for failing to
preserve this issue for appeal.

We have previously indicated in this opinion that a peti-
tioner who claims ineffectiveness of counsel must set forth
sufficient facts upon which a reviewing court can conclude
that counsel may have been effective. *Commonwealth v.
Durst, supra; Commonwealth v. Pettus, supra.* On re-
view of the record of the suppression hearing, we note there
was testimony by a police officer that the police obtained a
warrant for appellant's arrest on November 3, 1987, and
that the warrant was executed and defendant arrested on
November 5, 1987. The record indicates that the warrant

was executed at 33 West Pomona Street in the City of Philadelphia at 7:59 a.m. No other details concerning the execution of the warrant were provided. There is nothing in the petitioner's claim of any alleged flaw or defect in the warrant or in its issuance. The record simply indicates that after the warrant was executed, appellant was transported to the Homicide Division of the police department. Since the record contains no testimony or evidence relevant to a claim that the knock-and-announce rule was violated, it appears again the issue was never raised.

Appellant's allegations are bare of any facts to indicate a violation of the knock-and-announce rule. On these grounds, we cannot hold there are valid claims of ineffectiveness. We will not hold that counsel was ineffective for not raising or preserving a claim that has no valid existence. While this court is willing to liberally construe materials filed by a *pro se* litigant, appellant is not entitled to any particular advantage because of his lack of legal training. *O'Neill v. Checker Motors Corporation,* 389 Pa.Super. 430, 567 A.2d 680 (1989). "[A]ny layperson choosing to represent himself in a legal proceeding must, to some reasonable extent, assume the risk that his lack of expertise and legal training will prove his undoing." *Vann v. Commonwealth, Unemployment Compensation Board of Review,* 508 Pa. 139, 148, 494 A.2d 1081, 1086 (1985).

In the instant case, appellant pleads the knock-and-announce rule as the basis of his ineffectiveness claim. He asserts that counsel was ineffective for failing to preserve this issue in post-verdict motions and for appeal. Counsel would not be ineffective for failing to preserve an issue in post-verdict motions if that issue was not one of the issues that had been addressed at the trial; in the instant case, the issue of whether the police followed the knock-and-announce rule in effectuating their arrest of appellant was not raised at the suppression hearing or thereafter. We decline to offer further assistance to appellant by becoming counsel for him in the interpretation of his pro se brief.

### D. Allegations of Delay in Appearing Before Magistrate

Appellant's next contention is that counsel was ineffective for failing to preserve for appeal the following issue: whether his statement to the police should have been suppressed where the statement was obtained after arrest and before arraignment, and there was a delay in arraignment under Pa.R.Crim.P., Rule 130(a), 42 Pa.C.S.A. There is no merit to appellant's contention. The record shows that appellant was arrested on November 5, 1987 at 7:59 a.m. From 10:15 a.m. until 1:15 p.m., appellant gave his statement to the police. Appellant was arraigned at 3:35 p.m.

Under the rule which appellant cites, "when a defendant has been arrested *without a warrant* in a court case, a complaint shall be filed against the defendant and the defendant shall be afforded a preliminary arraignment by the proper issuing authority without unnecessary delay." *Id.* (emphasis added). Clearly, Rule 130(a) is inapplicable here because the record demonstrates that the appellant's arrest was effectuated by warrant. Appellant's allegations of delay are also without merit.

In *Commonwealth v. Davenport*, 471 Pa. 278, 370 A.2d 301 (1977), the Pennsylvania Supreme Court held that if an accused is not arraigned within six hours of his arrest, any statement obtained after his arrest but before arraignment is inadmissible at trial. The rule in *Davenport* was modified by a plurality of the same court in *Commonwealth v. Duncan*, 514 Pa. 395, 525 A.2d 1177 (1987). In *Duncan*, the plurality held that if a statement is obtained from an accused within a six hour period after arrest, it is admissible as long as it was not obtained by coercion or other illegality. Only statements obtained after the six hour period has elapsed should be suppressed. *Id.*, 514 Pa. at 406, 525 A.2d at 1182–83. The *Davenport–Duncan* rule was recently further expanded in *Commonwealth v. Odrick*, 410 Pa.Super. 245, 599 A.2d 974 (1991). In that case, a panel of this court held that voluntary statements

given by an accused which are *initiated* within six hours after arrest may not be suppressed simply because the process of taking the statement runs over six hours. *Id.,* 410 Pa.Superior Ct. at 251, 599 A.2d at 977.

In the instant case, the record shows that appellant was in custody for seven hours and thirty-six minutes prior to his arraignment. However, the interview during which he gave his statement to police was completed within five hours and sixteen minutes of his arrest. The statement was completed well within the time period contemplated in *Duncan* and *Odrick.* Therefore, counsel was not ineffective for failing to preserve this issue for appeal.

### E. Allegations Concerning Post-sentence and Appellate Rights

Appellant contends that counsel was ineffective for not filing a motion to reconsider sentence and for failing to advise him of his right to appeal the judgment of sentence. Once again, we cite the requirement that an ineffectiveness claim cannot be asserted in a vacuum and must be supported by sufficient facts upon which a reviewing court can conclude that trial counsel may have been ineffective. *Commonwealth v. Pettus,* 492 Pa. at 563, 424 A.2d at 1332. Appellant has provided no such facts as to his claim of ineffectiveness for counsel's failure to file a motion to reconsider sentence. Appellant has not indicated in what manner the sentence imposed by the lower court was erroneous. The record reveals merely that appellant received the mandatory life sentence upon his conviction of first degree murder. The sentences imposed for conspiracy and aggravated assault, consisting of two five-to-ten year terms running consecutively with appellant's life sentence, were supported by the lower court's review of a presentence report and mental health evaluation. Thus, the sentence imposed for the latter two crimes meets the requirements of *Commonwealth v. Devers,* 519 Pa. 88, 546 A.2d 12 (1988).

Appellant has not provided this court with any information which would indicate that the lower court committed an error of law or abuse of discretion in imposing sentence, or that the court imposed a sentence which was manifestly excessive. Without such specific allegations, we are unable to hold that appellant has set forth even an arguable claim of ineffectiveness with regard to counsel's failure to file a motion to reconsider sentence. In regard to appellant's claim that counsel erred in failing to file a direct appeal, that claim is clearly without merit for appellant plainly is before this court at the present time on direct appeal of the judgment of sentence.

Judgment of sentence affirmed.

JOHNSON, J., concurs in the result.