J-S50020-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SAMUEL LAMONT PIERCE | : | |
| | : | |
| Appellant | : | No. 1887 WDA 2017 |

Appeal from the PCRA Order November 13, 2017
In the Court of Common Pleas of Washington County
Criminal Division at No(s): CP-63-CR-0001991-2007

BEFORE: BOWES, J., OTT, J., and KUNSELMAN, J.

MEMORANDUM BY OTT, J.: **FILED MARCH 20, 2019**

Samuel Lamont Pierce appeals, *pro se*,[1] from the order entered November 13, 2017, in the Washington County Court of Common Pleas dismissing his first petition for collateral relief filed pursuant to the Post Conviction Relief Act ("PCRA").[2] Pierce seeks relief from a sentence of life imprisonment, imposed after a jury convicted him of first-degree murder.[3] On appeal, Pierce raises claims counsel provided ineffective assistance for failing to raise the issue of a third DNA profile on the alleged murder weapon before the jury. For the reasons below, we affirm.

---

[1] As will be explained *infra*, Pierce is *pro se* because PCRA counsel filed a petition to withdraw with the PCRA court, which allowed counsel to withdraw.

[2] 42 Pa.C.S. §§ 9541-9546.

[3] 18 Pa.C.S. § 2502(a).

We take the following underlying facts and procedural history from this Court's opinion filed on May 10, 2010, on direct appeal:

At approximately 9:00 a.m. on Sunday, January 7, 2001, Washington City Police Lieutenant Joseph E. Janflone responded to a radio dispatch to confirm the well-being of an eighty-three-year-old woman residing in the Maple Terrace apartment complex, the decedent, Venzella Smith. After arriving at Ms. Smith's first-floor apartment, Lieutenant Janflone learned from a neighbor, John Saffel, that Ms. Smith had not been seen for two days. Lieutenant Janflone gained entrance to the residence through an unlocked rear door. Thereafter, accompanied by a second police officer, Lieutenant Janflone discovered Ms. Smith's bludgeoned, bloody body lying on the bed in her bedroom. After confirming that Ms. Smith was dead, Lieutenant Janflone secured the crime scene and contacted the supervising investigator, Chief Robert Redlinger.[1] Lieutenant Janflone did not observe signs of forced entry into or a struggle inside Ms. Smith's apartment.

_____

[1] During 2004, then-Lieutenant Redlinger resigned from the Washington City Police Department in order to become the Chief of East Washington Borough's Police Department. Herein, we refer to the witness as Chief Redlinger.

_____

As part of the investigation, Lieutenant Janflone interviewed tenants in the neighboring apartments, including [Pierce] who resided in the second-floor apartment directly above Ms. Smith's residence. [Pierce] informed Lieutenant Janflone that he had recently moved into his apartment. He stated that he had seen Ms. Smith around the apartment complex, but he did not know her. [Pierce] also indicated that he was home the prior evening and did not hear noises coming from Ms. Smith's apartment. Significantly, [Pierce] did not indicate that he had been in Ms. Smith's apartment or mention Kenneth Wheeler, the individual [Pierce] later alleged to be the assailant.

During the trial, Chief Redlinger testified that upon arriving at the crime scene, he confirmed that no signs existed of forced entry or a struggle inside the apartment. Chief Redlinger observed Ms. Smith's body lying on her bed with blood on her face and "a tremendous amount of blood all around and underneath

her." She had lacerations on her neck and head. The hem of Ms. Smith's nightgown was raised above her waist and the bed sheets and comforter were pulled off the bed. Large amounts of blood had pooled on her pillows. More of Ms. Smith's blood was discovered splattered across the wall behind her bed.

Near Ms. Smith's headboard, Chief Redlinger observed a three-foot wooden club that resembled a table leg covered with a white sock. One end of the sock-covered club had blood on it. A video recording of the crime scene demonstrated that the club had been secreted partially under Ms. Smith's pillow. Chief Redlinger found two additional wooden clubs covered with black socks lying on the bed. Further investigation by Pennsylvania State Police Corporal Beverly Ashton, an expert in blood splatter, revealed that the white sock-covered club had a void in the splatter pattern of Ms. Smith's blood that was consistent with someone gripping the club during the assault. She also indicated that the samples submitted to the laboratory for testing had been removed from the portion of the sock that covered the grip of the club.

Leon Rozin, M.D., a forensic pathologist, testified that he performed the autopsy on Ms. Smith on January 7, 2001. An external examination of Ms. Smith revealed multiple stab wounds in her neck, multiple lacerations of the skull, and signs of asphyxiation. The internal examination confirmed the slash and stab wounds of the neck and also revealed a perforated larynx and pharynx and severe hemorrhaging near the vagaus, which Dr. Rozin explained was compressing the nerve and blood vessels that integrate the heart and lungs.

Dr. Rozin indicated that Ms. Smith had fractures on her fingers and contusions and bruises on both of her hands that were consistent with defensive trauma incurred while she was recoiling from the blows. He also discovered large hemorrhages in Ms. Smith's eyes that indicated that the airway in her neck had been compressed with a blunt object. The examination of Ms. Smith's head revealed ten subcutaneous injuries consistent with blunt force trauma.

In sum, Dr. Rozin concluded that Ms. Smith's death was caused by a combination of "blunt force trauma of the head, compression of the neck which caused asphyxiation[,] and sharp force trauma to the neck." Dr. Rozin testified that the white-sock-covered club was capable of causing the blunt force trauma.

Having found the manner of death unnatural and ruled out suicide, Dr. Rozin concluded that Ms. Smith was the victim of homicide. Id.

Relating to the physical evidence, Chief Redlinger explained to the court that the police officers collected and marked the sock-covered clubs and bedding and transported the evidence to the police station for investigation by the Pennsylvania State Police crime laboratory. The police also collected evidence from Ms. Smith's autopsy, including oral and vaginal swabs, fingernail clippings, and clothing. All of the items were submitted to the State Police crime laboratory during 2001, but there was no determination of another person's DNA on the items other than Ms. Smith's. The investigation remained open, however, and following advances in DNA testing technology, the police department resubmitted certain items for DNA testing during 2003, including the black and white socks that covered two of the wooden clubs. The second submission revealed a foreign DNA profile on the white sock. The investigators reviewed the foreign DNA profile against a DNA database but no matches were uncovered at that time. The investigation was idle until the fall of 2007, when Washington City Police Detective Daniel Stanek was informed that the Combined DNA Indexing System ("CODIS") registered a DNA match between [Pierce] and the foreign DNA on the white sock.

During the trial, Pamela J. Call, a forensic scientist employed by the Commonwealth of Pennsylvania at the State Police DNA Laboratory in Greensburg, explained how she discovered the DNA match. [Pierce] stipulated that Ms. Call was an expert witness in the field of forensic DNA analysis. Ms. Call testified that she entered the foreign DNA profile into CODIS that eventually identified [Pierce] in 2007. She later tested a buccal sample from [Pierce] that Detective Stanek provided to confirm the match to the foreign DNA found on the white sock. Based upon the results of the confirmatory tests, Ms. Call calculated the statistical likelihood that the mixture of DNA found on the white sock was 3.5 trillion times more likely to have come from a combination of Ms. Smith and [Pierce] than from a combination of Ms. Smith and any other African American.

Armed with the new DNA evidence, Detective Stanek traveled to New Haven, Connecticut with an arrest warrant in order to interview [Pierce] and obtain the buccal sample that

- 4 -

would confirm [Pierce]'s DNA. The New Haven Police arranged for [Pierce] to come to the police station voluntarily. Detective Stanek did not alert [Pierce] that he possessed an arrest warrant predicated upon the CODIS DNA match. Instead, Detective Stanek advised [Pierce] of his Miranda rights and asked him general questions about Ms. Smith's murder. Initially, [Pierce] reiterated the story he had conveyed to Lieutenant Janflone during 2001; however, after Detective Stanek produced the arrest warrant, [Pierce] provided a second account wherein he and Kenneth Wheeler had been inside Ms. Smith's apartment and that Mr. Wheeler had committed the murder. [Pierce] stressed that he did not harm Ms. Smith. [Pierce] asserted that Mr. Wheeler threatened him during the attack. Furthermore, [Pierce] stated that he was unsure whether he touched any items during the incident, which he characterized as crazy, and he indicated that he could not account for his every move inside the residence. However, upon waiving extradition and returning to Pennsylvania, [Pierce] advised Detective Stanek to "hold off" on telling the district attorney about Mr. Wheeler's alleged involvement.

The Commonwealth also adduced circumstantial evidence of [Pierce]'s guilt. During the trial, Mr. Saffel testified that he occupied a two-story apartment that shared a common wall with Ms. Smith on the first floor and [Pierce] on the second floor. N.T., 3/10/09, at 85. Mr. Saffel indicated that he heard loud banging emanating from Ms. Smith's bedroom at approximately 1:30 a.m. Saturday morning. A few minutes later, he heard someone running up the steps to [Pierce]'s second-floor apartment and water running in [Pierce]'s bathroom. Mr. Saffel also testified that he knew Kenneth Wheeler and that he did not observe Mr. Wheeler in the area that weekend.

Based on the aforementioned evidence, a jury convicted [Pierce] of first degree murder. On April 28, 2009, the trial court imposed life imprisonment. [Pierce] did not file post-sentence motions.

***Commonwealth v. Pierce***, 4 A.3d 187 [932 WDA 2009] (Pa. Super. 2010)

(unpublished memorandum at 1-8) (record citations omitted).

Pierce filed a direct appeal, raising sufficiency, weight, and suppression

issues. A panel of this Court affirmed Pierce's judgment of sentence, and the

Pennsylvania Supreme Court denied his petition for allowance of appeal. *See*

*id.*, *appeal denied*, 17 A.3d 1253 (Pa. 2011).

The PCRA court set forth the remaining, tortuous procedural history as

follows:

On July 14, 2011, [Pierce] filed a timely *pro se* PCRA petition. On July 18, 2011, the trial court appointed Attorney Jeffrey Watson to represent [Pierce] in PCRA proceedings. Attorney Watson filed a *Turner*/*Finley* no-merit letter on September 26, 2011. Attorney Watson did not file a contemporaneous motion to withdraw as counsel and did not seek leave of court to withdraw within the no-merit letter itself. In addition, Attorney Watson did not provide proof that he informed [Pierce] of his rights following the filing of a no–merit letter. On October 11, 2011, former President Judge Debbie O'Dell Seneca issued a notice of intention to dismiss [Pierce]'s PCRA petition. [Pierce] filed an undated letter in response to the trial court's notice of its intention to dismiss the PCRA petition. Therein, he raised additional points in support of his PCRA claims. Attorney Watson filed a supplemental no-merit letter or, February 1, 2012 and again did not make a request to withdraw and did not offer proof that he sent [Pierce] a letter explaining his rights after the filing of a no–merit letter.

On February 20, 2012, the trial court dismissed [Pierce]'s PCRA petition without a hearing. Attorney Watson continued to represent [Pierce] and, on March 14, 2012, filed a notice of appeal. On April 16, 2012, Attorney Watson filed a no-merit brief with the Superior Court identifying certain issues that [Pierce] sought to raise. Before reviewing the merits of the underlying claims, the Superior Court addressed the strict procedure required of an attorney who files a *Turner*/*Finley* no-merit letter with a PCRA court. The Superior Court found that Attorney Watson did not comply with that procedure and remanded the case.

On remand from the Superior Court, former President Judge O'Dell Seneca appointed Attorney Mary Bates as new PCRA counsel on January 2, 2013. On June 11, 2013, Attorney Bates filed a Petition to Withdraw as Counsel. Therein, Attorney Bates stated that she "has concluded that, based upon her review of the claims asserted and the reasons set forth in the two No Merit Letters [from Attorney Watson] and this Honorable Court's ORDER

and Dismissal of [Pierce]'s PCRA Petition, that both of [Pierce]'s PCRA Petitions are without Merit and [Pierce] may now proceed *pro se*, or by privately retained counsel, or not at all." **See** Petition to Withdraw as Counsel, June 11, 2013, ¶ 11. Attorney Bates did not detail the nature and extent of her review of the case, did not list the issues that [Pierce] wants to have reviewed, and did not explain why and how those issues lack merit. There is nothing in the record detailing a diligent review of [Pierce]'s claims by Attorney Bates. From the record, it appears to this Court that Attorney Bates relied on the prior review of others. Former President Judge O'Dell Seneca granted Attorney Bates's request to withdraw as counsel on June 11, 2013, but did not issue a notice of intent to dismiss [Pierce]'s PCRA petition or take other action.

[Pierce] filed two motions to supplement his PCRA petition, dated June 18, 2013 and August 20, 1013, respectively. On September 10, 2013, former President Judge O'Dell Seneca appointed Attorney Thomas Agrafiotis as new PCRA counsel without explanation. According to the record, Attorney Agrafiotis did not file anything with respect to the case for close to three and a half years. The case was reassigned from former President Judge O'Dell Seneca to Judge Michael Lucas in 2016. Judge Lucas subsequently submitted a recusal form – he prosecuted the case while working in the District Attorney's Office. The case was reassigned from Judge Lucas to the undersigned in March 2017.

On March 9, 2017, Attorney Agrafiotis filed a Petition to Withdraw as Counsel. Therein, Attorney Agrafiotis states that he "agreed to keep this instant case after the expiration of his contract with the County as a Conflicts Counsel; said contract having expired on April 30, 2014."[2] Petition to Withdraw as Counsel, ¶ 14. Attorney Agrafiotis also states that he has "continued to represent [Pierce] and research any applicable law that may have assisted [Pierce]" including requesting additional evidence and/or facts from [Pierce] "on multiple occasions." **Id.** at ¶¶ 15-17. There is no further information concerning the extent of the research conducted or the dates of requests made to [Pierce] and Attorney Agrafiotis does not further explain the almost three and a half year delay.[3] In similar fashion to Attorney Bates's Petition to Withdraw, Attorney Agrafiotis states that he "has concluded based upon his review of the claims asserted and the reasons set forth in the two No Merit Letters of Attorney Watson, the Trial Court's Order dismissing [Pierce]'s PCRA Petition, and the reasons set forth in Attorney Bates' Petition to

Withdraw that [Pierce]'s PCRA Petition is without Merit." *Id.* at ¶ 23. Attorney Agrafiotis does not detail the nature and extent of his review of the case, does not list the issues that [Pierce] wants to have addressed, and does not explain why and how those issues lack merit based on his review. It appears to the Court that Attorney Agrafiotis incorporates the reasoning of Attorney Watson by way of reference to Attorney Watson's no-merit letters. Attorney Watson did list the nature and extent of his review, did identify issues [Pierce] wished to raise, and did provide an analysis for concluding that [Pierce]'s issues lacked merit. As explained above, however, Attorney Watson failed to comply with all of the procedural requirements of *Turner/Finley* in that he did not make a request to withdraw and did not offer proof that he sent [Pierce] a letter explaining his rights after the filing of a no-merit letter.

_____

[2] The Court notes that there is nothing in the record to indicate that Attorney Agrafiotis filed anything on the case in the almost 8 months between being assigned the case and his contract expiring. Moreover, once the trial court appoints counsel, he is to continue representation throughout the proceedings unless the court grants counsel permission to withdraw. *Commonwealth v. Quail*, 729 A.2d 571 (Pa. Super. Ct. 1999).

[3] Counsel must either file an amended petition or prepare a no-merit letter, helping a petitioner with a *pro se* petition is insufficient. *Commonwealth v. Duffey*, 713 A.2d 63 (Pa. 1998).

_____

This Court conducted its own independent review of the record in light of [Pierce]'s initial *pro se* PCRA petition and supplemental petitions. The Court identified an issue concerning the selection of jurors that none of [Pierce]'s appointed counsel addressed. On April 7, 2017, the Court issued an order directing Attorney Agrafiotis to submit a detailed letter complying with the requirements of *Turner/Finley* or an amended PCRA petition concerning the issue within 30 days. On May 10, 2017, the Court granted Attorney Agrafiotis's Motion for Extension to File *Turner/Finley* Letter or Amended PCRA Petition. Attorney Agrafiotis filed a no-merit letter on July 11, 2017.[4]

<sup></sup>4 The Court disagrees with Attorney Agrafiotis's comments that [Pierce]'s PCRA claims must fail because they are undeveloped in [Pierce]'s *pro se* petition. The Rules of Criminal Procedure expressly mandate that a defendant shall be entitled to legal counsel when filing a first time PCRA petition. It is the province of appointed counsel to evaluate and develop a defendant's claims. **See Commonwealth v. Williams**, 782 A.2d 517, 525 (Pa. 2001). If those claims cannot be developed due to a lack of evidence, a lack of merit, an uncooperative Defendant, etc., the appropriate course of action for PCRA counsel is to fully explain this in a no-merit letter.

This Court recognizes the procedural irregularities in this case. In view of Attorney Agrafiotis's incorporation of Attorney Watson's no-merit letters by way of reference, the Court considers the procedural requirements of **Turner/Finley** to have been met at a minimum. The Court is loath to incur further delay of the proceedings and is mindful of [Pierce]'s right to have his claims reviewed on the merits. As noted previously, the Court conducted its own independent review of the record and for the reasons set forth below finds that [Pierce]'s PCRA petition lacks merit.

PCRA Court Opinion, 8/31/2017, at 5-9.

On August 31, 2017, the PCRA court issued notice of its intent to dismiss the petition without first conducting an evidentiary hearing pursuant to Pa.R.Crim.P. 907, and granted counsel's request to withdraw from the matter. After receiving an extension, Pierce filed a response, titled "Motion for Leave of Court to Amend PCRA Petition," on November 13, 2017. Two days later,

the PCRA court entered an order dismissing Pierce's petition. This appeal followed.[4]

Preliminarily, we note: "[A]lthough this Court is willing to construe liberally materials filed by a *pro se* litigant, *pro se* status generally confers no special benefit upon an appellant." **Commonwealth v. Lyons**, 833 A.2d 245, 252 (Pa. Super. 2003), *appeal denied*, 879 A.2d 782 (Pa. 2005) (some citations omitted). "[A]ny layperson choosing to represent himself in a legal proceeding must, to some reasonable extent, assume the risk that his lack of expertise and legal training will prove his undoing." **Commonwealth v. Gray,** 608 A.2d 534, 550 (Pa. Super. 1992), *quoting* **Vann v. Commonwealth Unemployment Compensation Bd. of Review**, 494 A.2d 1081, 1086 (Pa. 1985). As such, we cannot serve as Pierce's counsel and litigate his claims for him.

While it appears Pierce raised numerous issues in his PCRA petition, Pierce focuses on one issue for this appeal – that counsel was ineffective for failing to raise the issue of a third DNA profile on the alleged murder weapon before the jury and failing to object when the Commonwealth did not inform the jury of such evidence. Pierce's Brief at 7-9. Specifically, he states, "Trial counsel failed to inform the jury that there was another male's DNA found on

_____

[4] The court did not order Pierce to file a concise statement of errors complained of on appeal under Pa.R.A.P. 1925(b). On December 26, 2017, the PCRA court entered a Pa.R.A.P. 1925(a) opinion, incorporating its August 31, 2017, opinion.

the white sock. Trial counsel failed to point out that the DNA database reflected that there was more than one male contributor to the portion of the DNA samples." *Id.* at 7 (citation omitted). Moreover, he argues, "Trial Counsel lacked any reasonable basis for failing to object when the state did not inform the jury of the second male's DNA and where it was found on the blunt object. Trial counsel's improper course of conduct was prejudicial resulting in an adverse effect upon the outcome of the proceedings." *Id.* at 8 (citation omitted). Further, Pierce states:

> Mr. Saffel a witness for the prosecutor testified that he did not see [Pierce] that weekend, as well, Saffel further went on to testify that moments after the loud banging had stopped he heard someone running up [Pierce]'s stairs and water running in [Pierce]'s bathroom. Saffel did not testify to who was running up the stairs, for all Saffel knew someone could have been coming down those stairs because Saffel did not see anyone at the time of the homicide.
>
> According to Saffel's statement he told the police he did not have any recollection of hearing anything that night and trial counsel failed to present Saffel with the statement he made to police the morning after the homicide. This could have been used as impeachment evidence during [Pierce]'s trial. As the trial court stated Pam Call testified[] to only where [Pierce]'s DNA was found on the white sock, but did not testify to the fact that the unknown male's DNA was also found on the white sock. Trial counsel failed to object to that misconduct by the prosecutor.

*Id.* at 9 (citation omitted).

We begin with our well-settled standard of review:

Our standard of review of a PCRA court's dismissal of a PCRA petition is limited to examining whether the PCRA court's determination is supported by the evidence of record and free of legal error. Great deference is granted to the findings of the PCRA

court, and these findings will not be disturbed unless they have no support in the certified record.

In order to prevail on a claim of ineffective assistance of counsel, an appellant must show three things: that the underlying claim has arguable merit, that counsel's performance was not reasonably designed to effectuate the defendant's interests, and that counsel's unreasonable performance prejudiced the defendant. A defendant is required to show actual prejudice; that is, that counsel's ineffectiveness was of such magnitude that it could have reasonably had an adverse effect on the outcome of the proceedings.

*Commonwealth v. Sampson*, 900 A.2d 887, 890 (Pa. Super. 2006) (quotations and citations omitted), *appeal denied*, 907 A.2d 1102 (Pa. 2006).

Here, the PCRA court provided a well-reasoned explanation for denying Pierce relief:

As set forth in the facts above, a three-foot wooden club that resembled a table leg covered with a white sock was found at the crime scene secreted partially under Ms. Smith's pillow. One end of the sock-covered club had blood on it. Further investigation by Corporal Beverly Ashton, an expert in blood splatter, revealed that the white sock-covered club had a void in the splatter pattern of Ms. Smith's blood that was consistent with someone gripping the club during the assault. Corporal Ashton also indicated that the samples submitted to the laboratory for testing had been removed from the portion of the sock that covered the grip of the club.

During the trial, Ms. Call explained the DNA analysis that she performed to the jury. Ms. Call testified that sample from the white sock produced a mixture of DNA of Ms. Smith and an unknown male. Ms. Call submitted the foreign DNA profile to CODIS, which ultimately returned a match to [Pierce]. Ms. Call later tested a buccal sample from [Pierce] to confirm [Pierce]'s match to the male foreign DNA found on the white sock. Based on the results of the confirmatory tests, Ms. Call calculated the statistical likelihood that the mixture of DNA found on the white sock was 3.5 trillion times more likely to have come from a combination of Ms. Smith and [Pierce] than from a combination of

- 12 -

Ms. Smith and any other African American individual. Ms. Call did not testify that there was a third DNA profile found on the white sock.

[Pierce] presented his own expert, William Watson, who reviewed the testing that was performed by the state's laboratory. Mr. Watson explained that a person must physically come into contact with an item to deposit their DNA thereon. Mr. Watson testified that the profile from the white sock sample produced a mixture of DNA of a male and a female and that the profile was consistent with that of the victim and [Pierce]. Mr. Watson did not testify that there was evidence of a third DNA profile on the white sock. *See* Defense Exhibit F (report of Mr. Watson indicating that the mixed profile from item Q3 (the white sock) was consistent with the profiles of the victim and [Pierce]; no other profile was identified). He did state that there was a problem with the initial testing of the sample – contamination in a reagent blank or negative control. However, Mr. Watson acknowledged that contamination is not uncommon in forensic laboratories. Mr. Watson testified that to resolve a contamination problem, a new sample from the original evidence is needed for DNA extraction. Mr. Watson acknowledged that the Pennsylvania State Police crime lab did "exactly that" in this case.

Considering that neither forensic expert concluded that there was a third DNA profile on the white sock, the Court finds that trial counsel was not ineffective for failing to raise the issue. Were trial counsel to have asked either Ms. Call or Mr. Watson about a third DNA profile, a negative response could have further highlighted [Pierce]'s participation in the crime and forestalled [Pierce]'s argument that Kenneth Wheeler committed the murder. Trial counsel subpoenaed Mr. Wheeler to testify at the trial. When called to the witness stand, the Court provided an oral colloquy to Mr. Wheeler. After the colloquy, Mr. Wheeler stated that he would decline to testify.[7] Trial counsel cannot be held to be ineffective for Mr. Wheeler exercising his Fifth Amendment right against self-incrimination. The Court finds that trial counsel's actions concerning the DNA evidence had some reasonable basis designed to effectuate his client's interest.

_____

[7] Despite the fact that [Pierce] informed the police that Mr. Wheeler murdered Ms. Smith, he argues in his supplemental

- 13 -

> *pro se* PCRA [petition] filed on December 2, 2011 with the Washington County Clerk of Courts that "an unknown male is the actual culprate [sic]." *See* Count 4. It is untenable for [Pierce] to inform the police and his trial counsel that Mr. Wheeler committed the murder prior to the trial, but argue after the trial that counsel was ineffective for failing to investigate that some unknown person was the culprit.

PCRA Court Opinion, 8/31/2017, at 19-21 (some citations omitted).

Following our review of the record, we agree with the PCRA court's analysis that this allegation of ineffectiveness had no merit and counsel's performance was reasonably designed to effectuate Pierce's interests. Neither expert DNA witness, Call nor Watson, testified that there was a third DNA profile found on the white sock. Furthermore, Pierce has presented no such evidence to substantiate his argument, including his assertion regarding Saffel's testimony. Accordingly, the PCRA court properly denied Pierce relief regarding his claim.

We add one additional comment. In his brief, Pierce presents generalized allegations of ineffectiveness as to prior counsel, Watson, Bates and Agrafiotis, and their alleged failure to review his case in a diligent manner and raise the issue of "unknown male DNA" found on the sock. *See* Pierce's Brief at 10-13. While we understand Pierce was appointed a series of attorneys who, to varying degrees, failed to comply with the requirements of **Turner/Finley**, we find this of no consequence based upon the PCRA court's mention that it did not want to let this case prolong any further and that it had conducted its own independent review of the record as well as Pierce's

substantive argument and our above-provided analysis – that there was no evidence of a third DNA profile found on the sock and therefore, counsel cannot be deemed ineffective for failing to raise a meritless claim. Moreover, Pierce does not specify any other issues he wished his attorneys would raise and failed to do so. Accordingly, we need not address this claim further.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/20/2019