J-S51013-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DERRICK EUGENE JOHNSON | : | |
| | : | |
| Appellant | : | No. 1222 MDA 2018 |

Appeal from the PCRA Order Entered June 29, 2018
In the Court of Common Pleas of York County
Criminal Division at No(s):  CP-67-CR-0005271-2013

BEFORE:  PANELLA, P.J., GANTMAN, P.J.E., and MUSMANNO, J.

MEMORANDUM BY PANELLA, P.J.:        **FILED DECEMBER 10, 2019**

Derrick Eugene Johnson appeals, *pro se*, from the June 29, 2018, order entered in the York County Court of Common Pleas, which dismissed his first petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546. Johnson seeks relief from a term of life imprisonment, imposed on June 25, 2014, after a jury convicted him of first-degree murder[1] in the shooting death of Trevhan Kent ("the victim"). On appeal, he raises claims of prosecutorial misconduct, abuse of discretion, and ineffective assistance of counsel.[2]  Based on the following, we affirm.

---

[1]  18 Pa.C.S.A. § 2502(a).

[2]  Based on the nature of Johnson's claims, we have reordered his issues and will address the third argument first, and then the remaining two.

A panel of this Court previously set forth the underlying factual and procedural history on direct appeal as follows:

Lamin Goodman testified that, on the evening of January 13, 2013, he and the victim, were playing pool at Temptations Bar on East Market Street in York, Pennsylvania. Some words were exchanged with another group of men, one of whom was Johnson. Goodman testified that he and the victim decided to leave, but one of the men in Johnson's group punched the victim in the face. When Johnson moved to join the fray, Goodman jumped in to stop him. The fight ended ten to fifteen minutes later. Sometime during the fight, the victim was stabbed in the rib area. *See* N.T., 6/9-11/2014, at 116-126.

Goodman explained that a month later, on February 17, 2013, he received a text message from the victim, stating that the victim was at Pandora's, another bar in York, and "the same guys that [they] had an altercation with prior" were at the bar. *Id.* at 128. Goodman went to meet the victim, but by the time he arrived, Johnson and his cohorts had left. Goodman and the victim then decided to go to Temptations. While they were waiting for drinks, they noticed Johnson and another man try to enter the club, but were turned away by the bartender. Goodman testified that he and the victim stayed at Temptations for another 45 minutes because they "didn't want to get into any problems." *Id.* at 136. After having the bartender check to ensure no one was waiting on the street, Goodman and the victim then left through the door of the adjoining bar, NV's Bar and Grill. As they began to walk home, Goodman heard a gunshot coming from behind. When he saw the victim start running, he fled in another direction, and eventually ran into a police officer. Goodman did not see who shot at him and the victim. *See id.* at 140-144.

Amanda Trout testified that she was working as a dancer at Temptations on the night of the shooting. After her shift, she left the club through the door to NV's Bar and Grill. At that time, she saw Johnson, whom she knew as "Ace," and another man standing in the covered entrance of Temptations. *Id.* at 168-170. She said, "Hey, what's up?" and found it "unusual" that Johnson did not respond because she "normally talked to him, maybe once a week or so." *Id.* at 170. She decided to go to her friend's house across the street from the club. As she closed the door, she heard a gunshot. Although she did not see the shooter, Trout testified that

- 2 -

the only people she noticed on the street when she left the club were Johnson and his friend. *See id.* at 170-172.

Khadijah Weary testified that she was also working as a dancer at Temptations on the night of the shooting, and that Johnson, whom she knew as "Ace" and Damian Banks,[1] whom she called "Dre," were there to give her a ride home. When she walked outside and greeted the men, she gave them both a hug, and felt that each had a gun on his hip. Johnson even pulled back his jacket to show her the gun. *Id.* at 243-245, 248-249. Weary testified that Johnson told her "everything was going to be okay and to go to the car." *Id.* at 250. Weary then waited in the car for about a half an hour before she heard three gunshots. Immediately thereafter, Weary saw Johnson and Banks running to the car. She began screaming at them to take her home, and when she leaned up from the backseat, she saw each man had a gun in his lap.

_____

[1] Banks and Weary were dating at that time. *Id.* at 245.

_____

Weary conceded that she gave several statements to police that differed from her trial testimony. *See id.* at 260-265. However, she explained that she was "scared for [her] life and scared that [Johnson and Banks were] going to hurt [her.]" *Id.* at 266. Weary also acknowledged that she lied to protect her then boyfriend, Banks. *Id.* at 274.

Damian Banks, who was facing murder charges for the same incident, also testified on behalf of the Commonwealth. Banks corroborated Goodman's story about the January 2013 bar fight involving Goodman and the victim. Banks acknowledged that he had punched the victim in the face after they started arguing. However, he did not know who stabbed the victim that night. *See id.* at 292-295. A few weeks later, Banks and Johnson saw the victim on the street, and Johnson told Banks, "I seen him a couple of times, and I got to do something before he do something to me." *Id.* at 296.

Banks' testimony regarding the night of the shooting largely confirmed the account provided by both Goodman and Weary.[2] Banks explained that he and Johnson first saw the victim at Pandora's earlier that evening. He testified that Johnson wanted

to "do something" to the victim there, but Banks told him there were too many cameras. *Id.* at 298. They ran into the victim again, however, when they went to Temptations to pick up Weary from work. When Weary emerged from the club, she gave him a hug, and he told her to "go to the car, I am about to go holler at my peoples real quick." *Id.* at 299. Banks testified he and Johnson were waiting in the covered entryway to Temptations, when Johnson saw the victim and Goodman exit the club through the bar next door.[3] Johnson said, "there they go right there," pulled a gun from his hip and fired a shot, using a laser for accuracy, at the victim's back. *Id.* at 303. Banks and Johnson both ran to the car and fled the scene.

_____

[2] Banks' testimony differed somewhat from Weary's in that he claimed he was not carrying a gun that night, and that Weary never hugged Johnson. *Id.* at 309-310.

[3] Banks testified he was waiting for a friend to bring him "some weed." *Id.* at 312.

_____

Banks also testified that after he was arrested for the murder, he was in the York County Prison in a cell near Johnson. At one point, Johnson told him, "You and I are the only ones that know what happened, and you and I both know I did it." *Id.* at 307. Banks confirmed that when Johnson made the statement, Banks' cellmate, Samuel Lawson, overheard the conversation.

On cross-examination, Banks admitted that he was the one who assaulted the victim during the January 2013 altercation. Furthermore, he acknowledged that he expected his first-degree murder charge would be dropped as a result of his testimony. *See id.* at 308, 313. However, he further testified no concrete agreement had been reached.[4] *Id.* at 290.

_____

[4] We note that on June 26, 2014, the murder charge pending against Banks was withdrawn. *See* CP-67-CR-3933-2014.

_____

The Commonwealth also presented the testimony of Samuel Lawson who corroborated Banks' testimony regarding the

conversation between Banks and Johnson at the York County Prison. According to Lawson, Banks asked Johnson, "Why am I here?" *Id.* at 341. Lawson testified that Johnson replied,

> I'm not the reason you're here, the bitch Khadijah, ask her. And he also stated that, you don't have anything to worry about, because I did it. The only person that knows what happened that night is me and you.

*Id.* Under cross-examination, Lawson admitted he did not see Johnson when he made the statement, because Johnson was in the shower, but he did see him immediately thereafter. *Id.* at 343, 347. He also conceded he was facing a felony drug charge for delivering cocaine, and he expected some type of consideration in exchange for his testimony. *Id.* at 345.

Johnson presented only two witnesses in his defense.[5] Private investigator George Morrison testified that when he interviewed Amanda Trout, she admitted to him she was a heroin addict, and had been using four to six bags of heroin a day at the time of the shooting. *Id.* at 359-360. Morrison also testified Trout asked him questions about recanting her former statement. *Id.* at 360. Additionally, Kalvin Beady testified he was incarcerated with Banks and Johnson at the time Lawson allegedly overheard Johnson confess to the crime. Beady stated he heard the conversation in question, and at no time did either Banks or Johnson state Johnson was the shooter. *Id.* at 363.

_____

[5] Johnson did not testify on his own behalf.

_____

Johnson was eventually apprehended in Memphis, Tennessee, while using a fake driver's license, and charged with first-degree murder. A jury trial was conducted from June 9, 2014 through June 11, 2014. On June 11, 2014, the jury returned a verdict of guilty on the charge of first-degree murder. Thereafter, on June 25, 2014, Johnson was sentenced to a mandatory term of life imprisonment. He filed a timely post-sentence motion challenging both the weight and sufficiency of the evidence, which the trial court denied on November 24, 2014.

***Commonwealth v. Johnson***, 131 A.3d 86, 2160 MDA 2014 at *1-3 (Pa. Super., filed August 7, 2015) (unpublished memorandum).

This Court affirmed his judgment of sentence on August 7, 2015,[3] and the Pennsylvania Supreme Court denied his petition for allowance of appeal on December 22, 2015. ***See id.***

Johnson filed this, his first, *pro se*, PCRA petition on March 24, 2017. From March of 2017 to December of 2017, the PCRA court appointed four attorneys to represent Johnson. The most recent appointed counsel filed a motion to withdraw and ***Turner***/***Finley***[4] "no merit" letter on March 5, 2018. On June 7, 2018, the PCRA court granted counsel's motion to withdraw and issued a Pa.R.Crim.P. 907 notice of intent to dismiss Johnson's petition without a hearing. Johnson did not a file a response to the court's Rule 907 notice. Subsequently, on June 29, 2018, the court dismissed Johnson's petition, finding there were no genuine issues of material fact and he was not entitled to post-conviction relief. This *pro se* appeal followed.

Our standard of review with regard to PCRA petitions is well settled. "When reviewing the denial of a PCRA petition, we must determine whether the PCRA court's order is supported by the record and free of legal error."

---

[3] Johnson raised one claim on direct appeal – that the verdict was against the weight of the evidence.

[4] ***Commonwealth v. Turner***, 544 A.2d 927 (Pa. 1988), and ***Commonwealth v. Finley***, 550 A.2d 213 (Pa. Super. 1988) (*en banc*).

- 6 -

*Commonwealth v. Smith*, 181 A.3d 1168, 1174 (Pa. Super. 2018) (citation omitted). While we are generally bound by a PCRA court's credibility determinations, we apply a *de novo* standard to our review of the court's legal conclusions. *See id.*

Generally, all PCRA petitions "shall be filed within one year of the date the judgment [of sentence] becomes final" unless an exception applies. 42 Pa.C.S.A. § 9545(b)(1). The PCRA's time limitations are jurisdictional in nature and, as such, may not be altered or disregarded in order to address the merits of a petition. *See Commonwealth v. Bennett*, 930 A.2d 1264, 1267 (Pa. 2007). As the timeliness of a petition is separate from the merits of Johnson's underlying claims, we must first determine whether the PCRA petition is timely filed. *See Commonwealth v. Stokes*, 959 A.2d 306, 310 (Pa. 2008).

Here, Johnson's judgment of sentence became final on March 21, 2016, following the Pennsylvania Supreme Court's denial of his petition for allowance of appeal on December 22, 2015, and the expiration of the 90-day period for filing a petition for writ of *certiorari*. *See* 42 Pa.C.S.A. § 9545(b)(3); U.S. Sup. Ct. R. 13. Therefore, under the PCRA one-year time limitation, any PCRA petition was required to be filed by March 21, 2017. *See* 42 Pa.C.S.A. § 9545(b)(1). Here, the docket reflects that Johnson's petition was filed on March 24, 2017, three days late.

Nevertheless, pursuant to the "prisoner mailbox rule," a *pro se* prisoner's document is deemed filed on the date he delivers it to prison

authorities for mailing. **See** Pa.R.A.P. 121(a); **see generally,** **Commonwealth v. Wilson**, 911 A.2d 942, 944 n.2 (Pa. Super 2006). However, to avail oneself of the mailbox rule, a prisoner must supply sufficient proof of the date of the mailing. **See Commonwealth v. Jones**, 700 A.2d 423, 426 (Pa. 1997) (accepting any reasonable verifiable evidence of the date a prisoner places his filing in the control of prison authorities); **Commonwealth v. Perez**, 799 A.2d 848, 851 (Pa. Super. 2002) (finding certified mail receipt sufficient evidence of date prisoner deposited his notice of appeal in the prison mail system).

Turning to the present record, Johnson included an envelope for the petition, stamped with an Inmate Mail Pennsylvania Department of Corrections postage that is dated March 21, 2017, which was within the one-year period. Based on the record, and applying the "prisoner mailbox rule," we conclude Johnson has provided sufficient proof that he filed a timely PCRA petition. We may now proceed to the merits of his appeal.

Preliminarily, we note a review of Johnson's brief reveals he identifies 14 issues in his statement of questions involved, **see** Appellant's Brief at 5-6, but only elaborates on three of those claims in the argument section, **see id.** at 10-23. "[A]lthough this Court is willing to construe liberally materials filed by a *pro se* litigant, *pro se* status generally confers no special benefit upon an appellant." **Commonwealth v. Lyons**, 833 A.2d 245, 252 (Pa. Super. 2003) (citations omitted). "[A]ny layperson choosing to represent himself in a legal

proceeding must, to some reasonable extent, assume the risk that his lack of expertise and legal training will prove his undoing." **Commonwealth v. Gray,** 608 A.2d 534, 550 (Pa. Super. 1992) (citation omitted). As such, we cannot serve as Johnson's counsel and litigate his claims for him. Further, it is well settled that any "issue identified on appeal but not developed in the appellant's brief is abandoned and, therefore, waived." **Commonwealth v. Heggins**, 809 A.2d 908, 912 n.2 (Pa. Super. 2002). Accordingly, those non-developed issues are waived.

In his third enumerated argument, Johnson raises a claim of prosecutorial misconduct, which appears to be in reference to a statement made by the Commonwealth during opening arguments. **See** Appellant's Brief at 22-23. We note that, generally, claims of trial court error and prosecutorial misconduct, other than those enumerated in 42 Pa.C.S.A. § 9543(a)(2)(i-viii), are not cognizable under the PCRA. **See also** 42 Pa.C.S.A. § 9544(b) ("For purposes of this subchapter, an issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding"). Here, Johnson could have raised his claim of prosecutorial misconduct on direct appeal, but failed to do so. Accordingly, we conclude this argument is waived and need not address it further.

With respect to Johnson's first enumerated argument, titled "Abuse of Discretion," Appellant's Brief at 10, we find his discussion to be disjointed and

difficult to follow at times with no cogent train of thought. Johnson appears to set forth the following averments: (1) the Commonwealth withdrew the conspiracy counts to first and third degree murder charges in Johnson's case; (2) neither the court nor the parties informed the jury that to find Johnson guilty of first-degree murder, "it must be proven beyond a reasonable doubt that [Johnson] and co-defendant Damian Banks shared the intent to kill which is required for" first-degree murder based on an accomplice liability theory, *Id.* at 13; (3) Johnson's Fourteenth Amendment rights were violated because the trial court erred by allowing the theory of accomplice liability to be raised during closing arguments at trial; (4) his Sixth Amendment confrontation rights were violated because he never had a full and fair opportunity to cross-examine a witness, Trout, since he did not have vital impeachment evidence regarding the witness prior to the preliminary hearing; (5) his due process rights under the Sixth and Fourteenth Amendments were violated because the Commonwealth had knowledge that Trout committed perjury and withheld this information. *See id.* at 10-17.[5]

---

[5] For instance, the following is an example of Johnson's exact language:

> Prior to the start of [Johnson]'s Jury Trial, Commonwealth Attorney Ramseure withdrew Count 3 and Count 4, Conspiracy to First and Third Degree Murder. The only logical explanation behind this action was the [Johnson]'s Co-defendant, Damian Banks became a Commonwealth witness. [Johnson] is now going to trial on the theory that he committed the murder. All culpability was now absent in this case which drastically alter[ed] his defense

Upon review, Johnson fails to present a coherent legal argument on appeal. Accordingly, we find this argument waived. ***See*** Pa.R.A.P. 2101, 2119. ***See also Commonwealth v. Walter***, 966 A.2d 560, 567 (Pa. 2009) (finding waiver where argument was vague and confusing); ***Commonwealth v. Puksar***, 951 A.2d 267, 293-294 (Pa. 2008) (holding that failure to make or develop argument was fatal to claim). Furthermore, to the extent Johnson

--------------------------------------------------

> strategy because with Conspiracy charges now present, the defense now becomes that he and his Co-defendant did NOT murder the victim. Without conspiracy, defense strategy was that Appellant was NOT the murderer. 18 Pa. C.S. sec.306 (c).
>
> …
>
> To be an active accompli[c]e, one must be an active partner in the intent to commit the crime. An accompli[c]e must have done something to participate in the venture.
>
> In the Commonwealth's opening statement, the prosecutor stated "a witness is going to testify that the [Johnson] was planning to shoot the decedent in Pandora's Bar but was talked down." That witness was the co-defendant, Damian Banks who was then asked, "Why did you leave Pandora's." His response was "because I wasn't trying to get involved with anything going on as far as shooting or fighting or anything with Mr. Kent." The Commonwealth also asked Mr. Kent, "What happened at Pandora's Bar?" His response was, "We walked in the Bar, we had a drink. We seen Mr. Kent. Mr. Johnson was like [']Yo['], I got to do something to him now. I might as well get him now. I said, Ain't no sense. Too many cameras in here. And I am not trying to get involved with it." In 18 Pa. SC 306(c) as stated a person has to promote, facilitate, solicit, aids, agrees or attempts to aid such other person in planning or committing the offense.

Johnson's Brief at 11-12 (record citations and italics omitted).

again alleges that the trial court erred, we reiterate that he should have presented these arguments before the trial court and/or on direct appeal. ***See*** 42 Pa.C.S.A. § 9544(b).

Lastly, in Johnson's second enumerated argument, he raises several ineffective assistance of counsel assertions. ***See*** Appellant's Brief at 18-19. Specifically, he asserts the following: (1) counsel was ineffective for failing to impeach a witness, Khadijah Weary,[6] on grounds of prior inconsistent statements; (2) counsel was ineffective for failing to object to statements made by the Commonwealth during open and closing arguments concerning Johnson and his cohorts attempting to determine the identity of the victim, which he claims was a mischaracterization of the evidence; and (3) counsel was ineffective for failing to object to an erroneous jury instruction regarding accomplice liability because the conspiracy charges were withdrawn. ***See id.***

With respect to ineffectiveness claims, our standard of review is as follows:

> In order for [the a]ppellant to prevail on a claim of ineffective assistance of counsel, he must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. [The a]ppellant must demonstrate: (1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the

---

[6] Johnson refers to Weary as "Khadijah Okay" in his brief. Appellant's Brief at 18.

proceedings would have been different. The petitioner bears the burden of proving all three prongs of the test.

***Commonwealth v. Johnson***, 868 A.2d 1278, 1281 (Pa. Super. 2005) (citations omitted). "Counsel is presumed effective, and the appellant has the burden of proving otherwise." ***Commonwealth v. D'Collanfield***, 805 A.2d 1244, 1246 (Pa. Super. 2002) (citation omitted).

With respect to Johnson's first two allegations of ineffectiveness, a review of the record reveals that he failed to include these issues in his PCRA petition. ***See*** PCRA Petition, 3/24/2017, at 3-8.[7]  It is well-settled that

> [r]egardless of the reasons for [an a]ppellant's belated raising of [an] issue, it is indisputably waived. We have stressed that a claim not raised in a PCRA petition cannot be raised for the first time on appeal. We have reasoned that permitting a PCRA petitioner to append new claims to the appeal already on review would wrongly subvert the time limitation and serial petition restrictions of the PCRA. The proper vehicle for raising this claim is thus not the instant appeal, but rather is a subsequent PCRA petition.

***Commonwealth v. Santiago***, 855 A.2d 682, 691 (Pa. 2004) (internal brackets, citations, and quotation marks omitted). Accordingly, these issues are waived.

With respect to his remaining assertion, that counsel was ineffective for failing to object to an erroneous jury instruction regarding accomplice liability, Johnson fails to explain how counsel had no reasonable strategic basis for his

---

[7]  ***See also*** Rule 907 Notice, 6/7/2018.

inaction. *See Johnson*, 868 A.2d at 1281; *see also* Appellant's Brief at 21.

Furthermore, as the PCRA court found:

> [Johnson] contends that accomplice liability was argued in the Commonwealth's closing and that the Court instructed the jury in regard to accomplice liability. This is correct. [Johnson] claims, however, that accomplice liability does not pertain to this case and that the definition of accomplice liability is absent in this case. [Johnson]'s contentions are without merit and belied by the record. Numerous witnesses testified that [Johnson] and Damian Banks were together:
>
> - for the original altercation with the Victim at Temptations bar;
>
> - when they went back to the house to figure out who Trevahn Kent was;
>
> - a week after the fight when they saw the Victim driving by and the statement was made "I need to get him before he gets me."
>
> - on the night the shooting occurred, in the alcove outside the bar, waiting for the Victim and Lamin Goodman to leave the club.
>
> Given the foregoing, if the jury did not find that [Johnson] was the shooter, they could still have found [Johnson] guilty of murder based upon [a]ccomplice [l]iability. Therefore, [a]ccomplice [l]iability does pertain to this case. As a result, [t]rial [c]ounsel was not ineffective for failing to argue that accomplice liability is not applicable. Moreover, the Court properly instructed the jury regarding [a]ccomplice [l]iability, and included in those instructions was the definition of [a]ccomplice [l]iability.

Rule 907 Notice, 6/7/2018, at unnumbered 2-3. Our review indicates the court's analysis is well supported by the record. We therefore agree with the court's conclusion that Johnson also failed to establish that the underlying

claim had arguable merit. Accordingly, we conclude Johnson's final argument is unavailing.

Having discerned no error of law, we affirm the PCRA court's June 29, 2018 order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/10/2019