**COMMONWEALTH of Pennsylvania,**
**Appellee,**

v.

**Danny DEVINE, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 24, 2000.
Filed April 13, 2000.

---

Barbara A. McDermott, Philadelphia, for appellant.

Catherine L. Marshall, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before JOHNSON, J., CERCONE, President Judge Emeritus, and OLSZEWSKI, J.

CERCONE, President Judge Emeritus.

¶ 1 This is a direct appeal from a judgment of sentence following Appellant's conviction for first degree murder, criminal conspiracy, violations of the Uniform Firearms Act, recklessly endangering another person and possessing instruments of crime.[1] We affirm.

¶ 2 Appellant was arrested on September 4, 1997 for the aforementioned offenses. Following the denial of his suppression motion, he proceeded to a bench trial before the Honorable Steven R. Geroff. Appellant was convicted on January 21, 1999 and subsequently was sentenced to a mandatory term of life imprisonment for the first-degree murder conviction with concurrent sentences totaling ten (10) to twenty (20) years' imprisonment on the other convictions. This timely appeal followed.

¶ 3 The Trial Court aptly recounted the underlying facts of this case as follows:

On February 28, 1996 at approximately 5:30 p.m., the defendant and Junius Claiborne went to the 1300 block of South Mole Street to exact vengeance on two people know[n] as Jermaine and Edmund, who had been involved in shooting their friend Marcus earlier in the day. The intention of both defendants was to kill Jermaine and Edmund. The defendant was armed with a .22 caliber handgun, and Junius Claiborne was armed with a nine millimeter handgun. When they arrived at 1300 South Mole Street, Jermaine and Edmund were

there. Defendant, Danny DeVine, shot first; Jermaine and Edmund returned fire. Both defendants were shooting. Unfortunately, Shafeeq Murrell, age fifteen, who was standing on the sidewalk on South Mole Street, was caught in the line of fire and was shot with a small caliber bullet just above the left eyebrow. The bullet penetrated his skull and caused his death.

Trial Court Opinion, filed 7/7/99, at 6–7.

¶ 4 Appellant raises three (3) issues for our review:

■ Whether the trial court erred in denying appellant's motion to suppress?
[2.] Whether the evidence was insufficient to sustain the verdict of guilt to murder in the first degree?
■ Whether the first degree murder conviction was against the weight of the evidence?

Appellant's Brief at 3.[2] We will address them *seriatim.*

■ ¶ 5 We recently reiterated our role in reviewing the denial of a suppression motion and stated that:

Our role is to determine whether the record supports the suppression court's factual findings and the legitimacy of the inferences and legal conclusions drawn from those findings. In making this determination, we may consider only the evidence of the prosecution's witnesses and so much of the defense as, fairly read in the context of the record as a whole, remains uncontradicted. When the factual findings of the suppression court are supported by the evidence, we may reverse only if there is an error in the legal conclusions drawn from those factual findings.

*Commonwealth v. Clark,* 746 A.2d 1128, 1133(Pa.Super.2000) *(en banc)* (citations

---

1. 18 Pa.C.S.A. §§ 2502, 903, 6106, 6108, 2705, and 907, respectively.

2. As Appellant has failed to present any argument in his brief portion relative to his third issue on appeal, we have deemed this issue waived. Pa.R.A.P. 2119(a); *See also, Com-* *monwealth v. Zewe,* 444 Pa.Super. 17, 663 A.2d 195, 199 (1995) (argument section of appellant's brief must include relevant discussion of points raised along with citations to pertinent authorities).

omitted). Appellant's entire suppression argument is premised upon his belief that his rights were violated under the six (6) hour ruling set forth in the seminal cases of *Davenport* and *Duncan*.[3] Appellant argues that the Suppression Court erred in denying his motion given that he was held in police custody for nearly five and one-half hours (5–1/2) before he was questioned about the incident for which he was convicted. Specifically, Appellant complains that a documentary French film crew had "unfettered access" to him prior to the reading of his *Miranda* rights and subsequent interrogation by the police. Hence, Appellant avers that since his statement to the police "was not concluded until a minimum of thirty minutes after the six hour time limit had expired, the statement should have been suppressed." Appellant's Brief at 10.

¶ 6 The record reveals that Appellant was arrested on September 4, 1997 and brought to the police administration building at approximately 1:30 p.m. N.T. Suppression Hearing, 1/15/99, at 18–19. Appellant was placed in an interview room upon his arrival. *Id.*, at 19 & 45. Before Appellant was interrogated, two members of a French film crew, who were making a documentary for French television, spoke to Appellant while he was waiting in the interview room. *Id.*, at 46. The film crew moved in and out of the interview room during this time, but were instructed specifically by the arresting detective not to question Appellant about anything regarding the murder investigation. *Id.*, at 51, 47–48. During this time, Homicide Detective David Baker attended to the administrative paperwork concerning Appellant's arrest. *Id.*, at 46. Subsequently Detective Baker gave Appellant his *Miranda* warnings at 6:45 p.m. and began his interview with Appellant at 6:56 p.m. *Id.*, at 22 & 19. Although not specifically clear when the questioning ceased, the record does indicate that Appellant's statement was

faxed to the appropriate party from the District Attorney's Office at 8:05 p.m. *Id.*, at 54–55.

¶ 7 In *Commonwealth v. Washington*, 547 Pa. 550, 692 A.2d 1018 (1997) our Supreme Court set forth the fundamental underpinnings of the *Davenport* and *Duncan* rulings. The *Washington* Court stated:

In *Davenport*, this Court held that an arrestee must be arraigned within six hours of arrest in order "to guard against the coercive influence of custodial interrogation [and] to ensure that the rights to which an accused is entitled at preliminary arraignment are afforded without unnecessary delay." If arraignment did not occur within six hours of arrest, any statement by the accused obtained between arrest and arraignment was not admissible at trial.

Later, in *Commonwealth v. Duncan*, 514 Pa. 395, 525 A.2d 1177 (1987), the Court modified the rule, indicating that the crucial consideration was not the time of the arraignment. Rather, the "focus should be upon when the [defendant's] statement was obtained, i.e., within or beyond the six hour period." Thus, since *Duncan*, any statement obtained within six hours of arrest, absent coercion or other illegality, is not to be suppressed on the basis of *Davenport*.

*Id.*, 547 Pa. at 560, 692 A.2d at 1022–23. In recognition of the aforesaid principles, the Court in *Washington* declined to find a violation of the *Davenport–Duncan* rule since the appellant in that case gave an inculpatory statement within five (5) hours of being questioned in an interrogation room even though he had been in police custody for approximately twenty-eight (28) hours. The *Washington* Court noted that the record did reveal that appellant had languished in a holding cell while being processed into the criminal justice system on an unrelated charge prior to his removal to the interrogation room and

---

3. *See Commonwealth v. Davenport*, 471 Pa. 278, 370 A.2d 301 (1977) and *Commonwealth*

*v. Duncan*, 514 Pa. 395, 525 A.2d 1177 (1987) (plurality opinion), respectively.

questioning on the murder charge for which he was convicted. Even so, the Court found that no violation of the *Davenport–Duncan* rule existed due to its premise, which is based upon "a desire to avoid the coercive effect of *prolonged police interrogation*." *Id.*, 547 Pa. at 561, 692 A.2d at 1023 (emphasis supplied).

¶ 8 Next, our Supreme Court in its recent holding in *Commonwealth v. Persiano*, 555 Pa. 428, 725 A.2d 151 (1999) applied *Washington* and held that even though the appellant in that case had been in police custody for approximately eighteen (18) hours on an unrelated weapons charge, his confession to a unsolved murder occurred within three (3) hours from the time the custodial homicide interrogation *commenced*. Hence, the Court found that the confession occurred within the relevant six-hour period and did not violate the *Davenport–Duncan* rule. *Id.*, 555 Pa. at 432, 725 A.2d at 153.

¶ 9 We are also mindful of previous cases of this Court which have held that "absent facts pointing to an unnecessary delay due to police misconduct, voluntary statements given by a defendant and *initiated* within six hours after arrest may not be suppressed just because the process of obtaining the statement runs over six hours." *Commonwealth v. Odrick*, 410 Pa.Super. 245, 599 A.2d 974, 977 (1991) (emphasis supplied). The *Odrick* Court acknowledged that "[i]f we were to suppress all volunteered statements which happened to run past the six hour limit despite the absence of police abuse, we would be violating the parameters of the [*Davenport–Duncan* ] rule." *Id. See also, Commonwealth v. Gray*, 415 Pa.Super. 77, 608 A.2d 534, 551 (1992) (setting forth the principle announced in *Odrick* that a defendant's voluntary statements that are *initiated* within six hours following his arrest may not be suppressed simply because the process of taking the statement runs over six hours).

¶ 10 Given the applicable law on the subject involved herein and our careful inspection of the suppression record in this case, we agree with the Suppression Court's assessment that:

> [t]he defendant was arrested at 1:30 p.m.; the questioning by Detective Baker commenced at 6:56 p.m. and was concluded not later than 8:05 p.m. on September 4, 1997, well within the period provided by the six hour rule. Although the defendant claims that the film crew somehow induced his confession, the record is devoid of any evidence that the film crew acted improperly or in concert with the police.

Trial Court Opinion, 7/7/99 at 5 (citations omitted). Finally, even though we recognize that the presence of the French film crew was an atypical occurrence in this situation, we cannot conclude that the Suppression Court erred in denying Appellant's motion concerning any violations of the *Davenport–Duncan* rule and its progeny. *Commonwealth v. Clark, supra.*

¶ 11 Secondly, Appellant argues that the evidence was insufficient to sustain his first-degree murder conviction primarily due to his lack of specific intent to kill. Appellant avers that the eyewitness testimony of Khalil Adams did not support the Commonwealth's case and that the circumstances surrounding the shooting incident did not negate a self-defense claim. Also, Appellant baldly asserts that the "transferred intent doctrine" is not applicable in this matter.

¶ 12 As our Supreme Court has recently explained:

> In reviewing the sufficiency of the evidence, we must determine whether the evidence, and all reasonable inferences deducible from that, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all the elements of the offenses beyond a reasonable doubt.

*Commonwealth v. Johnson*, 556 Pa. 216, 223, 727 A.2d 1089, 1092 (1999). *Accord Commonwealth v. Hagan*, 539 Pa. 609, 613, 654 A.2d 541, 543 (1995). Aptly stat-

ed, in making this determination we must evaluate the entire trial record and consider all the evidence actually received. *Commonwealth v. Rodriquez*, 449 Pa.Super. 319, 673 A.2d 962, 965 (1996). It is within the province of the fact finder to determine the weight to be accorded each witness's testimony and to believe all, part, or none of the evidence introduced at trial. *Commonwealth v. Molinaro*, 429 Pa.Super. 29, 631 A.2d 1040, 1042 (1993). The facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence, but the question of any doubt is for the trier of fact unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances. *Commonwealth v. Seibert*, 424 Pa.Super. 242, 622 A.2d 361, 363 (1993), *appeal denied* 537 Pa. 631, 642 A.2d 485 (1994) (citing *Commonwealth v. Sullivan*, 472 Pa. 129, 150, 371 A.2d 468, 478 (1977) and *Commonwealth v. Libonati*, 346 Pa. 504, 508, 31 A.2d 95, 97 (1943)). "This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v. Swerdlow*, 431 Pa.Super. 453, 636 A.2d 1173, 1176 (1994) (citing *Commonwealth v. Hardcastle*, 519 Pa. 236, 246, 546 A.2d 1101, 1105 (1988)). Additionally, the Superior Court may not reweigh the evidence and substitute our judgment for that of the factfinder. *Commonwealth v. Cassidy*, 447 Pa.Super. 192, 668 A.2d 1143, 1144 (1995), *appeal denied* 545 Pa. 660, 681 A.2d 176 (1996).

¶ 13 Initially we recognize that:

[i]n order to prove first degree murder, the Commonwealth must demonstrate that a human being was unlawfully killed, that the defendant did the killing, and that the killing was done in an intentional, deliberate and premeditated manner. Furthermore, the use of a deadly weapon on a vital part of the body is sufficient evidence to prove the specific intent to kill.

*Commonwealth v. Michael*, 544 Pa. 105, 110–11, 674 A.2d 1044, 1047 (1996). *See also, Commonwealth v. Wayne*, 553 Pa. 614, 720 A.2d 456 (1998) (same). Also, the doctrine of "transferred intent" has been codified in this Commonwealth and reads:

**(b) Divergence between result designed or contemplated and actual result.**—When intentionally or knowingly causing a particular result is an element of an offense, the element is not established if the actual result is not within the intent or the contemplation of the actor **unless:**

(1) **the actual result differs from that designed or contemplated as the case may be, only in the respect that a different person or different property is injured** or affected or that the injury or harm designed or contemplated would have been more serious or more extensive than that caused; or

(2) the actual result involves the same kind of injury or harm as that designed or contemplated and is not too remote or accidental in its occurrence to have a bearing on the actor's liability or on the gravity of his offense.

18 Pa.C.S.A. § 303(b) (emphasis supplied). *See Commonwealth v. Gaynor*, 538 Pa. 258, 648 A.2d 295 (1994) (sets forth Commonwealth's burden under § 303(b)). Our close review of the applicable law and record in this case do not support Appellant's allegation that the evidence to convict him was insufficient.

¶ 14 The record reveals that Appellant's statement, redacted, given to Detective Baker was admitted into evidence and set forth the following:

**Appellant:** I then spotted Jermaine, then I fired the first shot from across the street at Jermaine. Then when Jermaine started firing back then one of the guys I was with started firing and then Rashon started firing. Then we had left the area.

**Detective:** Who is Jermaine.

**Appellant:** I know him by Jermaine. I don't know his last name.

**Detective:** What kind of gun were you shooting at Jermaine with.

**Appellant:** A 22.

**Detective:** What happened with that gun.

**Appellant:** I passed it off. I don't know what happened after that.

**Detective:** What kind of gun was anyone else using.

**Appellant:** A 9 millimeter.

**Detective:** You fired the first shot.

**Appellant:** Yes.

**Detective:** Why.

**Appellant:** I was closer to Jermaine.

**Detective:** Why did you shoot.

**Appellant:** Because of revenge.

. . .

**Detective:** When did you know Shafeeq had been shot.

**Appellant:** The next day.

**Detective:** When did you realize that you had been the one that shot Shafeeq.

**Appellant:** A month later.

**Detective:** How did you know.

**Appellant:** As people were saying where the shot came from.

. . .

**Detective:** Did you intend to kill Jermaine and Edmund?

**Appellant:** It was both sides, both sides wanted to kill each other.

**Detective:** So you did intend to kill Jermaine and Edmund?

**[Appellant]:** Yeah. It was an all out shootout, both sides.

**Detective:** Why didn't you go to the police when you realized that Shafeeq had died.

**Appellant:** Scared, shaken up.

**Detective:** Did you mean to kill anyone besides Jermaine and Edmund.

**Appellant:** No.

**Detective:** How many people were on the street during the shootout.

**Appellant:** Not many, a few.

**Detective:** Who did you tell about the killing of Shafeeq.

**Appellant:** I kept I humble.

**Detective:** Did you and anyone else you were with discuss what you would tell the police if questioned.

**Appellant:** Yes, just say we wasn't there.

**Detective:** Is there anything you wish to add to this statement.

**Appellant:** Yes. I didn't mean to shoot Shafeeq an innocent bystander.

**Detective:** Is everything you just told me the truth.

**Appellant:** Yes.

N.T. Trial, 1/20/99, at 155–159.

¶ 15 Our review of Kahlil Adams' testimony reveals that he was a friend of Appellant's and that he did observe Appellant firing a weapon at the relevant time in the direction of Jermaine. *Id.*, at 258, 267. Adams further witnessed the victim, Shafeeq Murrell, standing on the sidewalk talking to some girls and was positioned between Appellant and Jermaine. *Id.*, at 270, 272–74. In fact, Jermaine was on the sidewalk also and in a direct line behind Murrell, but one house further south on the street. *Id.*, at 273–74, 297–98. During his testimony it was revealed that Adams had given a previous statement to police and at that time he disclosed that Appellant had fired the first shot. *Id.*, at 281, 296. However, at trial Adams would only confirm that shots were being fired in all directions. *Id.*, at 317–319.

¶ 16 Upon our review of the evidence of record coupled with our standard of review, we cannot disagree with the Trial Court's findings that:

[t]here was sufficient credible evidence that the defendant went to the 1300 Block of South Mole Street with the

specific intent to kill Jermaine and [Edmund] to sustain a conviction for first-degree murder. He shot first and not in self-defense. Although no positive identification of the weapon used by the defendant was provided, the ballistics evidence and its location is consist[ent] with the scenario presented by Kahlil Adams. The fact finder properly concluded that it was a bullet from the defendant's gun, the only small caliber weapon used that day, which killed Shafeeq Murrell.

The fact that the bullet struck a person other than the one for whom it was intended does not affect the defendant's criminal responsibility. The defendant is guilty of first-degree murder under the transferred intent doctrine.

Trial Court Opinion, 7/7/99, at 9 (citations omitted). Thus, as the fact finder is free to determine the weight to be accorded a witness's testimony, we will not substitute our judgment for that of the Trial Court's in this instance. Accordingly, we are compelled to affirm Appellant's judgment of sentence.

¶ 17 Judgment of sentence affirmed.