**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LONDELL FALCONER, JR. | : | |
| | : | |
| Appellant | : | No. 18 WDA 2024 |

Appeal from the Judgment of Sentence Entered September 13, 2023
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s):  CP-02-CR-0004629-2022

BEFORE:  KUNSELMAN, J., SULLIVAN, J., and BECK, J.

MEMORANDUM BY SULLIVAN, J.:                    **FILED: MAY 15, 2025**

Londell Falconer, Jr. ("Falconer") appeals from the judgment of sentence imposed following his convictions for, *inter alia*, first-degree murder, criminal conspiracy (homicide), and related offenses.[1]  We affirm.

The factual and procedural history in this appeal—in which Falconer's challenge is limited to the sufficiency of the evidence supporting his first-degree murder conviction—is uncontested.  Falconer's convictions arise from his participation in a drive-by shooting, during which he served as the driver of a vehicle from which his co-defendant, Markez Anger ("Anger"), fired twelve rounds into another vehicle, in an attempt to shoot a teenager therein

---

[1] *See* 18 Pa.C.S.A. §§ 2502(a), 903(a).

("H.N."). Instead, Anger struck an infant passenger ("D.T.") several times,

killing him.[2]

The trial court summarized the factual and procedural history in further

detail, which we set forth below in relevant part:

> . . . On May 29, 2022, Tylajae Allen [("Allen")] drove a Jeep Wrangler . . . to PPG Plaza on Fourth Avenue in downtown Pittsburgh. The other occupants of the vehicle were front seat passenger[, a teenage passenger,] H.N., and Allen's cousin Deashea Green [("Green")] and Green's 18-month-old son D.T. Green and D.T. were located in the rear seats. They arrived around 2:45 p.m. H.N. and D.T., who was buckled into a child safety seat, remained in the vehicle while Green and Allen went inside to inquire about renting a penthouse for Allen's 21st birthday. Minutes later, while H.N. was turned facing D.T., he heard shots being fired. He ducked down without seeing the suspect vehicle or the suspects. When he felt it was safe, H.N. fled from the vehicle, leaving D.T. inside.
>
> The police investigation uncovered surveillance footage from various street and building cameras that shows a Jeep Compass . . . turn onto Fourth Avenue from Stanwix Street. As it approached the Wrangler occupied by both H.N. and D.T., the Compass slowed down and maneuvered close to H.N.'s vehicle. The front seat passenger of the Compass then props himself out the window, positioning the top part of his body over the roof while facing the rear of the vehicle. This individual then fired multiple shots in the direction of the Wrangler before tucking back inside the Compass as it fled the scene. A total of twelve 9-millimeter cartridge casings, all fired from the same weapon, were recovered from the scene along with multiple bullet fragments. Many of these bullets struck and/or entered the Wrangler. D.T. suffered multiple gunshots to the head which caused his death. H.N. did not suffer any injuries.
>
> Police identified the suspect vehicle from this footage and were able to trace its movements before, during, and after the

---

[2] Anger appealed from his judgment of sentence; his case is pending at *Commonwealth v. Anger*, No. 107 WDA 2024 (J-S03027-25).

shooting, as captured by numerous surveillance cameras. This footage was shown at trial through a compilation video.

Beginning at 2:05 p.m., the Compass leaves the parking area of Allegheny Commons, a housing complex in the Northside section of Pittsburgh, and enters I-279 towards downtown Pittsburgh. A white Chevy Tahoe[, which the parties agreed was owned by Anger's mother,] turns onto Fourth Avenue where the Wrangler is parked and circles around the block, later returning to Stanwix Street. While the Tahoe is stopped in the left lane at a red light, the Compass pulls up alongside the Tahoe in the right lane. The Tahoe reverses slightly and the Compass turns left in front of the Tahoe while making a U-turn on Stanwix. The Tahoe follows behind the Compass. At 2:47 p.m.[,] the Compass turns onto Fourth Avenue while the Tahoe continues straight on Stanwix.

As detailed above, when the Compass approaches the Wrangler occupied by D.T. and H.N., the front seat passenger appears out the window and fires several rounds at the parked car. . . ..

At 2:51 p.m., approximately five minutes after the shooting, the white Tahoe that appeared to be driving in tandem with the Compass arrives at Allegheny Commons. Minutes later, the Compass arrives at the same location and the occupants exit. . . . The two individuals walk towards the building in a casual gait and appear relaxed. Approximately ten minutes later, both individuals reemerge from the housing complex. The driver reenters the Compass [alone] and exits the parking lot. . . .. [The Tahoe is then shown leaving from its parking spot, and afterward, it is spotted at a nearby 7-Eleven.]

Detective Kevin Hodges [("Detective Hodges")] of the City of Pittsburgh Violence Prevention and Intelligence Unit testified that he is very familiar with Allegheny Commons and the people who live at and/or frequent the complex. . . . Detective Hodges identified . . . Anger [from surveillance footage from the 7-Eleven, which depicted Anger exiting the Tahoe and entering the business] . . ..

Around 5:00 p.m. on May 29, 2022, [the day of the shooting,] Mark Azen [("Azen")], a resident of the Troy Hill section of Pittsburgh, heard a commotion while unloading groceries from

his car on Tinsbury Street. He observed a dark colored vehicle park behind another vehicle, almost hitting it. Thereafter, he saw two black males dressed in white clothing exit the car and run in the direction of an alleyway near a Uni-Mart located on Lowrie Street. Azen approached the vehicle and observed that it was unoccupied and lacked license plates. Azen called 911 to report what he had witnessed.

Around this same time Michael Scopel [("Scopel")], who was working as a driver for Uber, answered a request for a ride from the Uni-Mart located on Lowrie Street in Troy Hill. Scopel testified that the customer was a young black male with a very stocky build named Londell[, *i.e.*, Falconer]. [Falconer] asked to be dropped off at a bank near Allegheny Commons. Surveillance footage from the bank corroborated Scopel's testimony, and Scopel identified both his vehicle and the male named Londell when shown the video at trial.

Detective Paul Becker [("Detective Becker")], a member of the Crime Scene Investigation Unit of the Pittsburgh Police Department, was one of several officers called to Tinsbury Street in response to Azen's 911 call. At the time, Detective Becker had been assisting in processing the crime scene from the shooting that occurred on Fourth Avenue. He was informed that the vehicle located on Tinsbury may be the suspect vehicle from the drive-by shooting. The vehicle was identified as a black Jeep Compass. It was positioned as described by Azen; parked up against another vehicle and without a license plate. There was visible damage to the bracket area, indicating that both the plate and bracket had been ripped from the frame. Police searched the immediate area, including the alleyway where Azen observed the two men flee. Here, they located a garbage can that contained two bent Illinois license plates and brackets along with a cardboard box containing Red Bull cans, t-shirts, and a Nyquil box. The items were processed[,] and City of Pittsburgh Police Detective John Godlewski, an expert in [l]atent [f]ingerprints, testified that [Falconer's] fingerprints were found on one of the Red Bull cans and the license plate. The Illinois license plate was a match to the suspect vehicle which, through further investigation, was determined to be a rental car. . . . A subsequent records search found no person with the name, date of birth, and address that was provided in the rental agreement.

* * * *

- 4 -

The Wrangler was also processed for evidence and[,] unsurprisingly, sustained significant ballistic damage. The bullet entries and strikes traveled from either the passenger side to the driver's side or from the front to the rear of the vehicle, with a downward trajectory. From the interior, police recovered a .45 caliber casing beneath the front seat, a 9 mm pistol, over $200, and 10 bricks and 2 bundles of heroin/fentanyl mix.

\* \* \* \*

Following his arrest on May 30, 2022, [Falconer] was interviewed at police headquarters by Detective Robert Shaw. During the interview [Falconer] denied being in the North Side area of the city or at Allegheny Commons on May 29, 2022. [Falconer] was then confronted with the video footage showing him at Allegheny Commons exiting the Compass . . .. [Falconer's] demeanor noticeably changed from relaxed and untroubled to nervous and visibly upset, and he began to cry. [Falconer] then changed his statement, admitting that he drove the Compass involved in the May 29, 2022 shooting. However, he did not identify the front seat passenger, repeatedly maintaining that he did not know the person. . . ..

\* \* \* \*

The trial commenced on June 5, 2023. After a two-day [non-jury] trial, the [c]ourt announced its verdict on June 7, 2023, wherein it found [Falconer] guilty of [first-degree murder; criminal conspiracy (homicide); criminal attempt (homicide), **see** 18 Pa.C.S.A. § 901; and aggravated assault, **see** 18 Pa.C.S.A. § 2702(a)(1)]. On September 13, 2023, the Court imposed a mandatory life sentence for the [f]irst-[d]egree [m]urder conviction[;] ten (10) to twenty (20) years of incarceration for . . . [c]riminal [c]onspiracy, and five (5) to ten (10) years for the [c]riminal [a]ttempt conviction . . ., resulting in an aggregate sentence of life imprisonment plus fifteen (15) to thirty (30) years.

[Following the denial of a timely post-sentence motion on] December 20, 2023[,] . . . a timely notice of appeal was filed on January 18, 2024.

Trial Ct. Op., 3/7/24, at 3-15 (citations to the record and footnotes omitted; some paragraphs re-ordered for clarity). Both Falconer and the trial court complied with Pa.R.A.P. 1925.

Falconer raises the following issue for our review:

Whether [] Falconer's conviction for [f]irst-[d]egree [m]urder can be sustained where, although the evidence and inferences drawn therefrom undoubtedly established that [] Anger was the gunman, the Commonwealth failed to prove, beyond a reasonable doubt, that [] Falconer had the specific intent to kill H.N. or D.T., the infant who ultimately was shot and killed?

Falconer's Br. at 5.

Our standard of review for sufficiency challenges is as follows:

As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, the fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the convictions will be upheld.

***Commonwealth v. Franklin***, 69 A.3d 719, 722–23 (Pa. Super. 2013) (internal citations, quotations, and brackets omitted).

Falconer challenges the sufficiency of the evidence supporting his accomplice liability for first-degree murder. Evidence is sufficient to sustain a conviction for first-degree murder when the Commonwealth establishes that: (1) a human being was unlawfully killed; (2) the accused is responsible for the killing; and (3) the accused acted with specific intent. ***See*** 18 Pa.C.S.A. § 2502(a); ***see also Commonwealth v. Chambers***, 980 A.2d 35, 44 (Pa. 2009).

A fact-finder may infer specific intent to kill based on the use of a deadly weapon upon a vital part of the victim's body. ***See Commonwealth v. Johnson***, 985 A.2 915, 920 (Pa. 2009). As this Court has noted, this Commonwealth recognizes the doctrine of "transfer of intent," whereby, if an actor intends to cause a particular result, the actor is liable, if "the actual result differs from that designed or contemplated . . . ***only in the respect that a different person . . . is injured***." ***Commonwealth v. Devine***, 750 A.2d 899, 904 (Pa. Super. 2000) (discussing 18 Pa.C.S.A. § 303(b)) (emphasis in ***Devine***). Specific intent to kill may be inferred where, for example, a defendant approaches a vehicle with a loaded firearm and empties an entire magazine into the occupied vehicle. ***See Commonwealth v. Rogers***, 615 A.2d 55, 64 (Pa. Super. 1992).

Further, it is well established that an accomplice is equally criminally liable for the acts of another if he acts with the intent of promoting or facilitating the commission of an offense and agrees, aids, or attempts to aid such other person in either planning or committing that offense. **See Commonwealth v. Spotz**, 716 A.2d 580, 585 (Pa. 1998). Where the crime involved is first-degree murder, "in order to sustain a conviction *via* accomplice liability, the Commonwealth's evidence must be sufficient to establish that [the defendant] possessed a specific intent to facilitate the crime at issue, *i.e.*, first[-]degree murder." **Id**. at 586. The shared criminal intent "between the principal and his accomplice may be inferred from a defendant's words or conduct or from the attendant circumstances." **Id**. **See also** 18 Pa.C.S.A. § 306 (setting forth the requirements for accomplice liability).

Falconer concedes that he was the driver of the vehicle, *i.e.*, the Compass, from which Anger fired twelve rounds into the Wrangler, killing D.T. **See** Falconer's Br. at 33. However, Falconer argues that the Commonwealth failed to prove he had specific intent to kill H.N., given the Commonwealth admitted no evidence of his motive for wanting H.N. dead. **See id**. He argues that the "only reasonable inference to draw therefrom was that [he] had no idea that [] Anger intended to open fire from the passenger window of his vehicle in an effort to kill H.N.," and that his, Falconer's, efforts to avoid apprehension thereafter do not alone establish he was an accomplice to the shooting. **See id**.

The trial court considered Falconer's argument and concluded, to the contrary, that the evidence was sufficient to sustain his conviction for first-degree murder *via* accomplice liability. The court explained:

> After a thorough review of the record in the present case, the [c]ourt finds that the facts presented at trial were more than sufficient to conclude that [Falconer] is culpable for first-degree murder as an accomplice to Anger.
>
> It is an accurate representation of the facts that Anger fired the fatal shots that took the life of D.T., with H.N. clearly being the intended target. This ambush style shooting, coupled with the sheer number of shots fired, undoubtedly demonstrated an intent to kill. . . ..
>
> The Commonwealth's meticulous presentation of [Falconer's] actions at trial proved however, that this brazen, targeted, day-time attack, was not a solitary act committed by Anger. [Falconer] admittedly drove Anger in the Compass, a rental car that police were unable to trace back to an identifiable person. Together, they traveled directly from the Allegheny Commons housing complex to the area where the Wrangler was parked. Once downtown, [Falconer] met up with the white Tahoe, which surveillance footage suggests surveyed and verified the position of the Wrangler/H.N. on Fourth Avenue prior to [Falconer] arriving. [Falconer] then separated from the Tahoe and turned onto Fourth Avenue. As [Falconer] approached the Wrangler, he slowed the vehicle and positioned it alongside the Wrangler in a manner that aided Anger in firing upon the vehicle occupied by H.N. and D.T. [Twelve] cartridge casings fired from the same gun were recovered from the scene, evidencing a barrage of bullets.
>
> [Falconer] immediately fled the scene with Anger and returned back to Allegheny Commons where the two parted ways. From there, as pieced together through fingerprint analysis, witness testimony, and surveillance footage, [Falconer] engaged in a series of evasive tactics. Namely, he abandoned the vehicle, and removed personal items and the license plates, which he later disposed of in a nearby garbage can. Additionally, when initially interviewed by police [Falconer] denied any involvement. When confronted with evidence of his participation during the interview, [Falconer] confessed to driving the car, and denied knowing the

identity of the front seat passenger. These subsequent actions, which all evidence consciousness of guilt, were just as revealing in proving [Falconer] shared an intent to kill H.N., and how his actions aided Anger in the commission of the offense.

Trial Ct. Op., 3/7/24, at 20-22.

Following our review, we likewise conclude Falconer's challenge to the sufficiency of the evidence merits no relief. Falconer does not contest that Anger fired the fatal shots which struck D.T., nor that Anger fired **twelve** shots into the vehicle which H.N. and D.T. occupied, which established Anger's specific intent to kill, which resulted in D.T.'s death.[3] **See Rogers**, 615 A.2d at 64 (specific intent to kill established by emptying a magazine into an occupied vehicle); **Devine**, 750 A.2d at 904 (specific intent to kill established via transfer of intent where there is specific intent, but an unintended victim dies instead). Falconer's accomplice liability is supported by the evidence of his shared specific intent to kill, namely, that he drove the Compass in coordination with the Tahoe to the Wrangler's location, maneuvered the Compass close to the Wrangler, and slowed down so as to give Anger the opportunity to fire twelve shots into the Wrangler, and only after Anger fired multiple rounds at the Wrangler, and H.N. exited and ran away, did Falconer speed up the vehicle and drive away.[4] Additionally, Falconer maneuvered the

_____

[3] **See** N.T., 6/5-7/23, at 187 (stipulation that twelve bullet casings were found at the scene of the shooting, all fired from the same gun, though the gun used to fire those rounds was not recovered).

[4] Our review of the video surveillance footage of the shooting confirms the trial court's recitation. **See** N.T., 6/5-7/23, Commonwealth's Ex. 7 at 5:40-5:56.

Compass in apparent coordination with the Tahoe that was at the scene of the shooting beforehand, and drove to the same location as that Tahoe following the shooting. *See* N.T., 6/5-7/23, Commonwealth's Ex. 7 at 4:35-5:25, 10:23-11:04. After the shooting, the evidence, which Falconer does not contest, shows that Falconer and Anger fled to avoid apprehension, and Falconer discarded evidence in an attempt to elude apprehension. Falconer's actions—including driving Anger to the scene of the shooting; coordinating before and after the shooting with the Tahoe; driving the Compass next to the Wrangler and slowing down so that Anger had the opportunity to fire multiple rounds into the Wrangler, before speeding off to elude apprehension; and Falconer's subsequent discarding of evidence—taken together in the light most favorable to the Commonwealth, establish his specific intent to aid Anger in committing first-degree murder. *See*, *e.g.*, *Spotz*, 716 A.2d at 586 (stating that accomplice liability may be found where the defendant "possessed a specific intent to facilitate the crime," *i.e.*, first-degree murder); *Johnson*, 985 A.2 at 920 (specific intent may be inferred from the use of a deadly weapon on a vital organ); *Rogers*, 615 A.2d at 64. (firing multiple rounds into an occupied vehicle may support a finding of specific intent to kill); *accord Commonwealth v. Potts*, 566 A.3d 287, 292 (Pa. Super. 1989) (a co-defendant's post-murder conduct, such as rifling through the pockets of the

victim, may rebut an assertion that the co-defendant was shocked by the killing and did not have specific intent to facilitate the murder).[5]

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 5/15/2025

---

[5] Falconer points to this Court's decision in **Commonwealth v. Schoff**, 911 A.2d 147 (Pa. Super. 2006), and our Supreme Court's decision in **Commonwealth v. Markman**, 916 A.2d 586 (Pa. 2007), for support in that those decisions involved more involvement by the defendants convicted, *via* accomplice liability, of first-degree murder. The defendant in **Schoff** planned the murder of her husband and solicited other people to assist, and obtained a weapon for the perpetrator, gave him the husband's location, and rented a car for him. **See Schoff**, 911 A.2d at 161-62. In **Markman**, the defendant bound the hands and feet of the victim, stuffed a cloth into her mouth, and tied a gag around her neck just before the defendant's paramour strangled the victim. Our Supreme Court held that the evidence supported a finding of guilt of first-degree murder as a principal or accomplice. **See Markman**, 916 A.2d at 598.

We reject Falconer's reliance on **Schoff** and **Markman** because, while those cases contained facts sufficient to support accomplice liability for first-degree murder, neither purports to set a floor as to the conduct required for establishing specific intent to facilitate first-degree murder.

- 12 -